# EXHIBIT A

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARTHUR J. GALLAGHER & CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil No. _____ |
| | ) | |
| ALLIANT INSURANCE SERVICES, | ) | |
| INC., AND STONE POINT CAPITAL, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>VERIFIED COMPLAINT</u>

Plaintiff Arthur J. Gallagher & Co. ("Gallagher" or "Plaintiff"), by and through its attorneys, for its Verified Complaint against Defendants Alliant Insurance Services, Inc. ("Alliant") and Stone Point Capital, LLC ("Stone Point" and with Alliant, collectively, "Defendants"), hereby alleges with knowledge as to itself and on information and belief as to all other matters, as follows:

## <u>NATURE OF THE ACTION</u>

1.     Gallagher brings this action to hold Alliant and its private equity owner and managers accountable for their multiple and ongoing unlawful attacks on Gallagher's business and client base, which include illegally poaching employees and clients, stealing confidential information, and copying of Gallagher documents and rebranding them as Alliant's.  To date, Defendants have unlawfully taken 39 employees and in excess of 80 clients from Gallagher, all as part of a

long-standing and ongoing illicit scheme to steal new business rather than grow it through legitimate means.

2.      Alliant is an insurance brokerage firm and a direct competitor of Gallagher.  Stone Point is the private equity firm that owns Alliant and takes an active (and compensated) role in Alliant's management, including in Alliant's practice of making aggressive raids on its competitors, which it euphemistically calls "add-on acquisitions."   Of course, they are not acquisitions, because Gallagher and not the employees own the books of business.  Indeed, it many cases Gallagher had already acquired the business from the employees, paying the employees significant funds for the purchase.  In addition, Stone Point funnels capital into Alliant that is used to fund the raids.  This capital allows Alliant to offer outsized compensation packages to employees of Gallagher and other competitors in order to induce them to breach their fiduciary and contractual duties (including valid restrictive covenants) for the benefit of Defendants.  Stone Point currently holds three of the eight seats on Alliant's Board of Directors, oversees and manages Alliant's benefits plans, and is paid an annual fee, worth millions of dollars, to "provide management services to Alliant."

3.      Defendants' conduct here is particularly brazen.  Earlier this year, Alliant approached Gallagher with a threat couched as an offer: sell Alliant the books of business it covets, or face the consequences.  When Gallagher refused

Alliant's "offer," the consequence Gallagher faced, and continues to face, was a large-scale raid on Gallagher's personnel and Gallagher's clients, conducted in blatant disregard for, and actively inducement to violate, the fiduciary and contractual duties those personnel owed to Gallagher.

4.      By now, this Court is familiar with Alliant's unlawful tactics.  A little over fourteen months ago, in a case captioned *Mountain West Series of Lockton Companies, LLC v. Alliant Insurance Services, Inc.*, No. 2019-0226-JTL (Del. Ch. 2019), Vice Chancellor J. Travis Laster issued a comprehensive 57-page opinion in which he found that Alliant "engineered" and "coordinate[d]" a sweeping raid against another competitor, known as Lockton.  *See Mt. West Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, No. 2019-0226-JTL, 2019 WL 2536104, at *1 (Del. Ch. June 20, 2019) (the "Lockton Opinion").

5.      In the Lockton Opinion, Vice Chancellor Laster found that Alliant induced Lockton employees to breach their contracts and initiate a "full-court press" to solicit Lockton's clients.  *Id.*  The Court found, among other things, that Alliant, with the assistance of its outside counsel, were responsible for "***secretive and underhanded behavior*** in violation of contractual obligations and legal requirements" and for attempting to "mask their activities under a ***façade of compliance measures*** and through misleading representations and averments."  *Id.* at *22 (emphasis added).

6.    As a result of these findings, Vice Chancellor Laster issued a preliminary injunction enjoining Alliant, along with its affiliated entities, (i) from soliciting or servicing the clients and prospects Alliant targeted in the Lockton raid—including those clients that had already switched to Alliant; and (ii) from soliciting Lockton employees, members, or consultants to leave Lockton and come work at Alliant.  *Id.* at *24-25.   Subsequently, on January 7, 2020, this Court entered a permanent injunction against Alliant, which remains in effect today, prohibiting Alliant from much of this same behavior (the "Lockton Injunction"). *Lockton*, No. 2019-0226-JTL (Del. Ch. Jan. 7, 2020).[1]   Stone Point owned and managed Alliant throughout the Lockton litigation.   In fact, the same three Stone Point principals have sat on Alliant's Board of Directors since at least August 2017.

7.    Gallagher brings this action in this Court because Alliant and Stone Point remain un-chastened in the face of the Lockton Opinion.   Despite the Lockton Injunction, Defendants have simply tweaked their playbook (the "Playbook") so that Alliant can continue pursuing its illicit conduct.

---

[1]    Pursuant to the Lockton Injunction, Alliant irrevocably consented to the jurisdiction of this Court for a period of four years in connection with "implementation and enforcement of" and "resolving any and all disputes related to compliance" with the Lockton Injunction.  *Lockton*, No. 2019-0226-JTL, ¶ 5 (Del. Ch. Jan. 7, 2020).  This lasts through June 2023.

8.     Gallagher is the latest target.   In contrast to Lockton, however, Alliant's raid on Gallagher has built gradually since at least December 2019.  Over the course of the past ten months, and up through today, Gallagher has been forced to play whack-a-mole as Alliant targets Gallagher offices and practice groups across the country and continues to steal Gallagher's employees and clients away, resulting in lawsuits across the United States.

9.     This past January 2020, during the early stages of the raid and just *days after* this Court entered the Lockton Injunction (which made clear that this Court would not tolerate Alliant's illegal raids on competitors), Defendants strategically decided to file, and Alliant then proceeded to file, a certificate of conversion pursuant to Section 266 of the Delaware General Corporation Law to un-incorporate from Delaware and re-incorporate in California (the "Certificate of Conversion").  This move was a transparent gambit to avoid this Court, which had unequivocally found Alliant's conduct to be unlawful.

10.     Alliant's raid on Gallagher has had a snowball effect that has caused, and continues to cause to this day, very real harm to Gallagher.  The raid is comprehensive in scope and designed to gradually strip Gallagher of its producers and employees (each a "Targeted Employee" and, collectively, the "Targeted

Employees"),[2] divert key client relationships, and misappropriate confidential information about clients and business strategies from Gallagher to Alliant. This conduct cannot be justified under the guise of healthy competition. Rather, Alliant has carried out these attacks in bad faith, after Gallagher rebuffed Alliant's coercive "offer," by unlawfully inducing the Targeted Employees to breach the clear terms of their valid and binding employment agreements (the "Agreements"), as well as their fiduciary duties to Gallagher.

11.     So far, Alliant has executed multiple attacks on Gallagher, resulting in significant disruption to Gallagher's client base and business. More information about these attacks—along with new ones that are still in the planning and solicitation stages—has come to light in the days leading up to the filing of this Complaint. There is no reason to think that Defendants are going to stop their unlawful conduct any time soon. In fact, such "leveraged" or "add-on" acquisitions are integral to Stone Point and Alliant's plan for growth.

12.     In these attacks, the Targeted Employees (both producers and employees) have breached their duties to and Agreements with Gallagher and joined Alliant. Their departures are highly synchronized. For the most part, the Targeted Employees do not provide any notice to Gallagher, whether or not

---

[2]     A current list of the 39 Targeted Employees can be found below. (*See infra* pp. 41-42 (**Figure 2**).)

contractually mandated. Instead, the Targeted Employees resign *"effective immediately"* and then commence (or perhaps continue) a single-minded campaign to solicit Gallagher's clients to Alliant. The lack of proper notice to Gallagher is calculated to maximize the disruption to Gallagher's business and facilitate the immediate solicitation of business away from Gallagher.

13.     The circumstances make clear that Alliant's attacks are planned well in advance, the result of serious breaches of fiduciary duty by the Targeted Employees. In one recent example, after the resignation of senior Gallagher producers, subordinate Targeted Employees were instructed to fill out online job applications on Alliant's website. Then, within minutes, they received a call from an Alliant administrator who was already familiar with their job title and confidential salary information. Within minutes after that, they had job offers in hand, with no background checks and no requests for references.

14.     Prior to and once at Alliant, the Targeted Employees violate the clear terms of the non-solicitation provisions in their Agreements with Gallagher, soliciting clients to transition business to Alliant and soliciting colleagues to work for Alliant. The Targeted Employees also violate provisions in their contracts regarding the use and misuse of confidential information, often sending Gallagher documents to their own personal email accounts that contain confidential

information about client accounts and business strategies, which Alliant then uses for its own benefit.

15.     These egregious and unlawful acts are all part and parcel of what has become the Playbook.  That Playbook has been tweaked and refined over the years, but at its core has remained largely the same, and continues to include what Vice Chancellor Laster in the Lockton Opinion recognized as reprehensible—and even fraudulent—instructions, actions, and behavior in clear derogation of the law. Indeed, the Playbook is premised upon the fact that Alliant will break the law (and induce others to do the same), but the return on investment from that unlawful activity is greater than the price that Alliant will likely have to pay in litigation and that Stone Point will likely have to contribute in equity influx.

16.     As detailed in a recent publication of The Insurer, over the course of the last 24 months, Alliant has been sued ***more than a dozen times***—in jurisdictions across the United States—by competitors for raids that follow this same Playbook.  Gallagher is the latest target:

## Figure 1.  Alliant's Raids Over The Last 24 Months

**Alliant's legal battles with rivals since 2018**

| Case | Date filed | Court | Plaintiff parent | Notes | Status |
|---|---|---|---|---|---|
| Corp Synergies Grp v Alliant et al | August 2018 | District of New Jersey | CORPORATE SYNERGIES | Employee benefits brokerage Corporate Synergies Group sued Alliant and four former employees who resigned in 2018, including Gregory Andrews who joined Alliant as SVP in New York | Settled in May 2020 |
| Insgroup v Langley | November 2018 | Texas state court | INSGROUP | Texas brokerage Insgroup sued over Alliant's hire of Jeff Langley as a Houston-based vice president | Ongoing |
| Mountain West Series v Alliant et al | March 2019 | Delaware Court of the Chancery | LOCKTON | Lockton sued Alliant after 20 professionals resigned en masse in its Denver office, including former CEO of the Mountain West Series Charles McDaniel | Settled in January 2020 |
| JLT Specialty Insurance Services v Justin Riccio et al | May 2019 | New York Supreme Court | MARSH & McLENNAN COMPANIES | JLT Specialty sued Alliant and six former New York state-based SVPs and VPs that provided insurance and risk management solutions: Justin Riccio, Patrick Walsh, Kathryn Carroll, John Decatur, Matt Franzese and Katherine Leto | Settled in March 2020 |
| USI Southwest v Cotuno et al | May 2019 | Texas state court | USI INSURANCE SERVICES | USI sued after the departure of Houston-based employee benefits specialist Daniel Cotuno to join Alliant as a VP | Ongoing, referred to mediation in September 2019 |
| HRO Benefit Advisors v Cox | May 2019 | Texas state court | ALERAGROUP | HRO sued after employee benefits specialist John Cox joined Alliant as vice president in Austin, Texas | Settled in November 2019 |
| Aon Risk Services v Alliant et al | November 2019 | North District of Illinois | AON | Aon sued over the hire of seven executives from its Construction Services Group in Chicago, including the practice's chief broking officer Matt Walsh | Parties have arrived at a resolution but not yet dismissed case |
| Alper Servs v Alliant et al | December 2019 | Illinois state court | ALPER SERVICES | Alper Services sued after Alliant hired Chicago-based property casualty insurance veteran Bobette Puckette as a VP in October | Alpers filed a voluntary dismissal of the case in August 2020 |
| Marsh USA v Vaught et al | February 2020 | New York Supreme Court | MARSH & McLENNAN COMPANIES | Marsh sued after seven staff joined Alliant's energy team in Houston in October, including Karey Vaught and Rick Dowling who were appointed managing directors | Ongoing |
| Servco Insurance v Soroka et al | February 2020 | Western District of Washington | SERVCO | Servco Insurance Services sued after Alliant made professional liability hires in Seattle last year, including Jay Soroka who joined as SVP | Settled in August 2020 |
| AssuredPartners of Washington et al v Acarregui et al | February 2020 | Western District of Washington | AssuredPartners | AssuredPartners sued after Mark Acarregui, former hospitality/restaurant insurance practice leader at its subsidiary MCM Insurance Services & Benefits, joined Alliant in Seattle in February | Settled in May 2020 |
| Arthur J Gallagher v Bacot | March 2020 | Texas state court | Gallagher | Arthur J Gallagher sued over Alliant's hire of Taylor Bacot as vice president in Houston | Settled in May 2020 |
| Arthur J Gallagher v Tarantino et al | August 2020 | Northern District of California | Gallagher | Arthur J Gallagher over the hire of four former Bay Area executives, including Don Tarantino and Michael Machette, alleging they conspired to poach its employees and had taken nearly 50 of its customers | Ongoing |

Source: *The insurer*, legal filings

Throughout this 24-month period, Stone Point has had the same three principals on Alliant's Board of Directors.

9

17.   Indeed, Stone Point cannot credibly claim ignorance of Alliant's unlawful and litigation-generating behavior.   In January 2019, Alliant raised significant money from Stone Point, which Alliant's Chairman and Chief Executive Officer, Tom Corbett, said would allow Alliant to "enter this exciting new stage in our growth strategy."   As detailed in **Figure 1** above, that "growth strategy" involved the raids of at least nine different competitors in the months that followed, including Gallagher.

18.   Publicly available information points directly to Stone Point as an active participant in Alliant's management and, more specifically, in the raid strategy that this Court has deemed to be illegal.   For example, in a publicly available audited financial statement, Alliant acknowledged that, as part of Stone Point's acquisition of Alliant in 2015, "Alliant entered into a monitoring agreement" with affiliates of Stone Point (and another private equity company that was previously a minority owner), whereby those entities would "provide management services to Alliant" in exchange for a multimillion dollar "monitoring fee," paid by Alliant.

19.   On its website, Stone Point expressly advertises that it assists Alliant's management with "all material add-on acquisitions" and Tom Corbett, Alliant's CEO, states that "[t]he resources and support Stone Point has provided have been essential to Alliant's success as we have actively grown our organization and

expanded our offerings."   Gallagher also understands, based on a September 3, 2020 call between an Alliant executive and a current Gallagher employee, that Stone Point and Alliant coordinate closely to ensure that Alliant has the cash and stock it needs to execute its targeted slate of leveraged hires.

20.     What remains clear is that Defendants are utterly undeterred by the devastating legal and factual findings in the Lockton Opinion and persist in wanton disregard of the Court's admonishment of Alliant's unlawful conduct.   Indeed, some of the ***very same*** Alliant employees whose conduct formed the basis of the Lockton Opinion—among others, Alliant executive Peter Arkley [3] —are now attacking Gallagher by brazenly engaging in the exact same conduct.

21.     In this case, to date, Alliant has successfully poached a total of 39 Targeted Employees from Gallagher, solicited scores of Gallagher clients, and diverted the brokerage, consulting, or benefits business of dozens of those clients, stripping Gallagher of longstanding client and employee relationships and the cross-selling and growth opportunities that inherently come with them.   The precise revenue lost or at risk because of Defendants' ongoing unlawful conduct

---

[3]     Arkley is a senior executive at Alliant who helped devise the Playbook, and used it in the raid on Lockton in March 2019.  Following the raid, Arkley sent a group text message to the new hires, congratulating them on having "***established a business in 3 ½ days***" and encouraging them to "***keep going!!!!***"   As Vice Chancellor Laster observed, "[t]he Former Employees did as they were asked." *Lockton*, 2019 WL 2536104, at *8 (emphasis added).

cannot, at this time, be readily quantified, but easily rises to the level of tens of millions of dollars.

22.   The ongoing solicitation of Gallagher clients and employees is also causing further irreparable harm, including, but not limited to, the harm caused by the diversion of resources and management time away from focusing on Gallagher's business.  Alliant's incessant raiding activity brings with it uncertainty, confusion, and stress, including with respect to Gallagher employees' job security and morale.  These are very real issues Gallagher is facing at this very moment because of Alliant's ongoing illegal conduct.

23.   Gallagher is now engaged in litigation on multiple fronts with various Targeted Employees who have breached their fiduciary and contractual duties to Gallagher in connection with their departures to Alliant.  When named as parties to such actions, Alliant has objected to being sued in the local jurisdiction, arguing "forum shopping."  This objection is not only wrong, but smacks of Defendants' bad faith.  To be clear, Alliant was a Delaware corporation when its raid on Gallagher began and it filed the Certificate of Conversion in order to facilitate that raid, which continues to this day.  Meanwhile, Stone Point—which owns and manages Alliant, made significant equity investments in Alliant in 2015 and 2019, and has been integral to the growth strategy of Alliant—remains a Delaware limited liability company.

24.     It is time for Defendants' gamesmanship to stop.  Gallagher brings this action before the Court of Chancery, pursuant to its powers to hear all matters and causes in equity and related claims, in order to put an end to Defendants' intentional and unlawful inducement of Gallagher's employees to breach their fiduciary and contractual obligations to Gallagher and Defendants' related theft of Gallagher's client relationships and confidential information.

25.     Through this action, Gallagher seeks an order preliminarily and permanently enjoining Defendants' unlawful conduct from proceeding further. Gallagher also seeks to recover damages for the quantifiable injuries that Defendants have already caused, and that Gallagher may continue to suffer as a direct and proximate result of Defendants' bad acts.

## PARTIES

26.     Plaintiff Gallagher is a Delaware corporation, with its principal place of business in Rolling Meadows, Illinois.  Gallagher is one of the largest insurance brokers in the world.  It also provides health and welfare consulting services, including employee benefits insurance, retirement plans, and administrative services.  Gallagher operates brokerage offices and businesses across the United States, including in Florida, Texas, California, Georgia, and the District of Columbia.

27.     Defendant Alliant changed its residence partway through the actions that give rise to this suit.  Until January 31, 2020 at 7:59 a.m. EST, Alliant was a Delaware corporation.  In January 2020, and just days after this Court entered the Lockton Injunction, Alliant filed a Certificate of Conversion, moving its state of incorporation from Delaware to California.  Effective January 31, 2020 at 8:00 a.m. EST, Alliant became, and now is, a California corporation.  Alliant's principal place of business is in Newport Beach, California.

28.     Defendant Stone Point is a Delaware limited liability company, with its principal place of business in Greenwich, Connecticut.  Stone Point is a private equity firm that invests in businesses within the global financial services industry, including those in the insurance distribution and services sector.  In 2015 and 2019, Stone Point invested significant amounts of capital in Alliant, and has maintained a controlling interest in Alliant since 2015.  Additionally, three members of Stone Point sit on Alliant's eight-person Board of Directors.

## JURISDICTION

29.     The Court of Chancery has subject matter jurisdiction pursuant to 10 *Del. C.* 341, which empowers the Court "to hear and determine all matters and causes in equity."  The Court has subject matter jurisdiction over Gallagher's remaining damages claims pursuant to the clean-up doctrine.

30.    The Court has jurisdiction over Stone Point, which is a limited liability company duly organized and existing under the laws of Delaware, and is therefore subject to the Delaware courts' general jurisdiction.

31.    The Court has jurisdiction over Alliant because it was a Delaware corporation at the time of much of the conduct giving rise to this suit, and further due to the substantial connections between Alliant's, and its co-conspirator Stone Point's, tortious conduct and Delaware.  Such connections include Stone Point's equity investments in Alliant in 2015 and 2019, which Alliant and Stone Point used to finance the hostile raid against Gallagher, and Alliant's filing of a Certificate of Conversion on January 29, 2020 with the Delaware Secretary of State.  The Certificate of Conversion was filed days after the Lockton Injunction, in a clear move by Alliant to avoid any future exposure to judicial scrutiny in Delaware, whose courts have already found Alliant's actions to be unlawful.  Additionally, Alliant would later use the Certificate of Conversion as part of its effort to induce the Targeted Employees to violate their Agreements.

## FACTUAL ALLEGATIONS

### I.    STONE POINT ACQUIRES OWNERSHIP OF ALLIANT

32.    By at least 2005, Stone Point had begun analyzing Alliant and the insurance brokerage industry.  On its website, Stone Point advertises that it

"studied Alliant extensively," even before Alliant's leveraged buyout in 2005, and continued to "track[]" Alliant in the years that followed.

33.     Then, on August 14, 2015, investment funds managed by an affiliate of Stone Point, along with preexisting employee owners and investment funds managed by another private equity fund, acquired 100% of the ownership interest of Alliant pursuant to an agreement and plan of merger (the "Stone Point Merger").

34.     In connection with the Stone Point Merger, Alliant entered into a monitoring agreement with affiliates of Stone Point and another private equity firm, under which Stone Point and the other private equity firm "provide management services to Alliant."  Pursuant to the agreement, Stone Point is paid a monitoring fee worth millions of dollars annually.

35.     On its website, Stone Point advertises that it plays an active role in Alliant.  Stone Point expressly states that it "assists [Alliant's] management with all material add-on acquisitions" and helps Alliant "evaluate business line expansion opportunities and alternative distribution strategies."  Stone Point is not a passive investor in Alliant.  Rather, it is ***intimately involved*** in building and supporting Alliant's growth strategy, including through the illegal attacks directed at Gallagher (among many others).

36.     Indeed, Stone Point has "led the process for all of Alliant's financings since the initial investment in 2015."  And, as Alliant's CEO, Tom Corbett, has

explained, Stone Point has provided Alliant with "the resources and support" that "have been *essential* to Alliant's success as [Alliant has] actively grown [its] organization and expanded [its] offerings."  Gallagher understands, based on a September 3, 2020 call between an Alliant executive and a current Gallagher employee, that Stone Point actively participates in Alliant's acquisitions, providing the cash Alliant needs to offer multi-year, guaranteed contracts to prospective hires and the stock that will allow poached employees to participate in an eventual exit transaction and make millions of dollars in the process.

37.    Moreover, three Stone Point principals occupy three of the eight seats on Alliant's Board of Directors.  In that capacity, the three Stone Point principals play an integral role in Alliant's management, growth, and employee retention.

38.    For example, one benefit offered to Alliant employees, including the Targeted Employees here, is the ability to invest in a pre-tax 401(k) plan administered pursuant to ERISA.  Alliant's Board of Directors, including the three Stone Point principals, control and manage the operation and administration of Alliant's 401(k) plan.  Alliant's Board of Directors also has direct oversight and knowledge of Alliant's business development and growth strategy—including the Playbook that Alliant has used for years to carry out its illegal raids, including against Gallagher.

17

## II.    STONE POINT AND ALLIANT DEVELOP THEIR PLAYBOOK

39.    Rather than fairly compete with Gallagher and other insurance brokers in the market, Alliant, working in connection and with oversight from Stone Point, has implemented in recent years a rapid growth strategy through "leveraged hires." Alliant engages in raids that intentionally and unlawfully violate the plain terms of the employment agreements of its competitors and make Alliant flush with clients and information it otherwise would not have at its disposal.  Rather than play by the rules, Stone Point and Alliant wantonly break them.

40.    Because of the inherent and often blatantly illegal nature of these raids, more than a dozen lawsuits have been filed by various competitors against Alliant over the past 24 months.  (*See supra* pp. 9 (**Figure 1**).)  For each raid, Alliant tweaks the Playbook slightly in an attempt to evade being held accountable. That said,  each raid shares the same core elements, detailed by this Court in the Lockton Opinion.

41.    First, Alliant identifies and targets producers and other employees at competitor brokers that it believes procure or service a sizeable "block of business" (each a "Targeted Hire" and, collectively, the "Targeted Hires").  Through various forms of outreach—LinkedIn connections and messaging, Facebook, friends or family that work at Alliant, and, more recently, third-party recruiting firms— Alliant makes initial contact with the Targeted Hires in an effort to gauge their

interest.  When speaking with a producer or management-level employee, Alliant asks, as an initial gatekeeping question, about the size of the business the Targeted Hire manages at the competitor and how much of that business can be brought over to Alliant.  Alliant makes clear that employment is conditioned upon the ability to immediately divert a sizeable chunk of client relationships to Alliant.  Alliant knows that the Targeted Hires are subject to employment agreements that restrict client and employee solicitations and diversions.  In fact, Alliant likewise uses similar non-solicitations agreements in its business for producers.

42.    Next, Alliant engages and pitches the Targeted Hire via a series of telephone calls, text messages, and in-person meetings.  During these interactions, Alliant provides the Targeted Hire with information about Alliant as well as term sheets containing financial and compensation structures.  Typically, Alliant also offers the Targeted Hire equity to further induce the Targeted Hire to betray his or her current employer.  At the same time, the Targeted Hire is expected to provide detailed confidential information to Alliant about the clients he or she manages.

43.    Gallagher understand that the Targeted Hire is judged not on his or her value, thoughts, skills, or ability to grow Alliant's existing business, but rather on the size and portability of the business he or she manages and can bring over to Alliant.

19

44.     During this same period, Alliant moves purposefully to create the illusion of compliance with the law.  Alliant will require the Targeted Hire to execute a so-called Prospective Employee Departure Protocol ("PEDP").  The PEDP is signed by the Targeted Hire while he or she is still working at his or her former employer (*i.e.*, Alliant's competitor).  The PEDP contains a series of statements, representations, and obligations that the Targeted Hire agrees to abide by in connection with his or her discussions with Alliant regarding potential future employment.  For example, the document provides that the Targeted Hire will not take or use any confidential information from its current employer and will not provide Alliant with any such information.  It also purports to require that the Targeted Hire, "[i]rrespective of your job title and responsibilities and whether or not you owe any legal duties or obligations to your current employer," perform his or her obligations under his or her current employment agreement.  To be clear, the PEDP is completely self-serving; Alliant knows that it will likely encounter lawsuits because of the unlawful nature of its raids and, when that day comes, Alliant hoists the PEDP as sword and shield against the consequences of the illicit conduct it induced.  The PEDP also confirms that the conduct engaged in by the Targeted Employees is wrongful, by purportedly prohibiting such conduct.  Yet when the Targeted Hires engage in such conduct, Alliant not only fails to take

action or notify the prior employer, but actively encourages and rewards such misconduct.

45.     Alliant also works with the Targeted Hire to coordinate the scope and logistics for the raid.  This includes working with the Targeted Hire, while he or she is still at the former employer, to identify other colleagues that Alliant and the Targeted Hire can—directly or indirectly—solicit to come to Alliant.  In addition, Alliant provides the Targeted Hire with instructions on how to carry out the raid. This includes coordinating details regarding the date and process for the resignations, which are strategically designed to occur suddenly in order to maximize disruption and at times to maximize client movement.  This process and preparation can take weeks or even months.

46.     Then, on a strategically determined date, the raid that has been privately schemed becomes public.  The instruction from Alliant to the Targeted Hires is clear:   (i) resignations, regardless of contractual obligations to the contrary, are to be "effective immediately"; and (ii) upon resigning, the Targeted Hire is to immediately devote all time and effort to making good on his or her promise to transition the competitor's clients to Alliant.  Before leaving, the Targeted Hire often steals confidential information, which Alliant then uses for its own benefit and to unfairly compete with the raided competitor, by, for example,

soliciting and immediately servicing Gallagher's clients that Alliant and the Targeted Hire have already positioned and prepared for the move to Alliant..

47.    Finally, Alliant makes sure that it has jobs—identical jobs—waiting for the Targeted Hire's team once the raid goes public.  Similar to the PEDP, the online application process for these jobs is a ruse.  The Targeted Hire's colleagues are instructed to apply for a job on Alliant's website and then are immediately contacted by Alliant and offered a job, without any formal interviews or references, for an amount that is above what he or she is currently being paid.  As Vice Chancellor Laster observed, this process is nothing more than "*a sham that Alliant and its counsel created* for purposes of litigation."  *Lockton*, 2019 WL 2536104, at *18 (emphasis added).  Like the PEDP, the process creates the façade of propriety, however thin that may be.

48.    The coda to this story is all-too familiar: the competitor has been seriously harmed by Alliant's sudden theft of its producers and employees along with large books of business and confidential information, and therefore brings suit against Alliant.  Alliant fully expects that the lawsuit is coming, and has worked for years with its go-to outside law firm to prepare for the litigation.   This preparation includes, among other things, (i) the Targeted Hires executing PEDPs; (ii) having a forensic team review the devices of the Targeted Hires to remove information that might be associated with the former employer; and (iii) compiling

self-serving declarations that lay out these measures and try to explain away what appears to be all too coincidental.  To support its version of the events, Alliant coaches the Targeted Hires to tell a story about why they left their old jobs and why their actions do not violate the plain terms of their ongoing restrictive covenants.  In their declarations, the lawyers echo this story.  As Vice Chancellor Laster aptly observed: "For a company that claims it was not doing anything wrong, Alliant expended a great deal of effort trying to cover it up."  *Id.* at *18.

49.    Even when Alliant is sued by a competitor, whose office and business it just attacked, Alliant gets to keep what it really wants: unlawfully obtained clients, business, employees, and confidential information that it can and does use to its advantage for years to come.  In the end, Alliant wins.

50.    As Alliant recently assured one Targeted Hire at Gallagher: The Playbook has "never failed."

## III.   DEFENDANTS EXECUTE THE PLAYBOOK ON GALLAGHER

### A.    <u>The Targeted Employees</u>

51.    In total, to date, Alliant has successfully executed the Playbook on 39 Targeted Employees at Gallagher.  Seven of those were producers at Gallagher; 32 of them were employees who worked alongside those producers.

52.    The current list of Targeted Employees is: Frank Albrecht, Bilal Ashraf, Rosemary Bruscino, Todd Burke, Spencer Brush, Jacklyn Concannon,

Derek Conway, Robyn Demchak, Ken Evelyn, Jared Finney, Dave Ghirardini, Theresa Graf, Craig Hamakawa, Eileen Hand, Bernadette Heater, Lisa Kavanagh, Gretchen Lambourne, Cheryl Lonergan, Michael Machette, Maria Maldonado, Sierra Maldonado, Linda Midyett, Steven Pierce, Cindy Perkins, Kristina Phillips, Brandi Price, John Quinlan, Amanda Ruemke, Brian Selna, Donald Tarantino, Salvatore Tarantino, Taylor Tarantino, Abby Thalachelloor, Pamela Tyrone, Cheri Veltman, Trinita Washington, Clay Williams, Elsa Wong, and Michelle Zabit. (*See infra* pp. 41-42 (**Figure 2**).)

53.     The Targeted Employees include some of Gallagher's most-valued producers, who had long terms of service at Gallagher and serviced some of its biggest and most important clients in key business sectors.  These producers were responsible for fostering and maintaining relationships with key decision-makers at Gallagher's clients, who in turn had authority to choose—and to switch—brokers. The producers have significant connections within Gallagher and strong teams of Gallagher employees working under them.  Some, like Don Tarantino and Michael Machette in San Francisco, have unique cross-selling capabilities or books of business.  Importantly, Gallagher acquired the books of business and/or insurance agencies of these producers, paying the producers millions for the clients and for contractual restrictions protecting the clients, whom Alliant is stealing away without any consideration to Gallagher.

54.     The Targeted Employees also have access to some of Gallagher's most important confidential information about clients and business strategies, which Gallagher has amassed over the years at considerable cost.  This includes, among many other things, confidential information about the client's insurance preferences and needs, pricing and coverage requirements, risk appetite, satisfaction, premiums, deductibles, collateral levels, commission arrangements, loss history, and renewal dates.

55.     In short, the Targeted Employees, as a whole, are uniquely situated to subvert the interest of Gallagher.  Alliant knows this, based on the Playbook and its years of experience conducting unlawful raids on competitors just like Gallagher, and Alliant takes advantage of this.

### B.      The Relevant Contracts

56.     Most of the Targeted Employees entered into Agreements when they joined Gallagher.[4]  The Agreements contain similar terms and conditions, which align with brokerage industry norms.   For example, the Agreements contain clauses barring solicitation of clients and employees ("Non-Solicitation Clauses") and provisions protecting confidential information.   Most of the Agreements contain provisions requiring that the Targeted Employee furnish a copy of his or her Agreement to a prospective new employer before beginning any new

---

[4]      Four of the Targeted Employees did not execute employment agreements.

employment in the insurance, benefits, or wealth management industries.  Most also contain notice provisions requiring that the Targeted Employee provide some form of notice to Gallagher before leaving (usually 21 days).  And most contain provisions recognizing the Targeted Employees' fiduciary duties to Gallagher.[5]

57.    More specifically, most of the Agreements contain Non-Solicitation Covenants that clearly prohibit the Targeted Employees from, for two years after leaving Gallagher, soliciting Gallagher's employees or clients, along with restrictive covenants that prohibit the Targeted Employees from misappropriating Gallagher's confidential information.

58.    For example, the Targeted Employees agree to the following language with respect to soliciting, either directly or indirectly, their co-workers to leave Gallagher:

> Employee recognizes that employees of the Company are a valuable resource of the Company.  Accordingly, during Employee's employment with the Company, Employee will not, directly or indirectly solicit, induce, entice or recruit any employee of the Company to leave their employment with the Company.  In addition, for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not directly or indirectly, solicit, induce or recruit any employee of the

---

[5]    This section of the Complaint uses model language from the Agreements of the Targeted Employees in Texas.  The language varies across the Agreements, but largely tracks the language referenced herein.

Company who has been provided Confidential Information to leave the employ of the Company.

59.     Most of the Targeted Employees also agree to the following language prohibiting them from servicing clients and soliciting, either directly or indirectly, one of Gallagher's current or prospective client accounts:

> For a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not, directly or indirectly, solicit, transfer, place, market, accept, aid, counsel or consult in the placement, renewal discontinuance or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services, or other insurance administrative or service functions ("insurance services") or provide employee benefit brokerage, consulting, or administrative services; in the area of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products; investment advisory services, wealth management, or group retirement services; defined benefit and defined compensation consulting, compensation program design, compensation and benefit surveys, and on-site human resources management; and all other employee benefit areas the company is involved with ("benefit services"), for: (x) any Account of the Company for which the Employee performed any of the foregoing functions during any part of the two-year period immediately preceding such termination (referred to hereinafter as "Protected Accounts"), or (y) any Prospective Account of the Company (as defined below).

60.     In addition, the Targeted Employees acknowledge their duty to protect Gallagher's confidential information.  For example, the Targeted Employees in

Texas acknowledge that "the Company's business depends to a great degree upon having information which is not generally known to others" and that the Targeted Employees "benefit significantly from having access to and being given Confidential Information."  Accordingly, the Targeted Employees agree that "for a period of two (2) years following the termination of [their] employment with the Company, [they] will not divulge Confidential Information . . . or make use of it for [their] own purpose or the purpose of another."

61.     Most of the Agreements also contain notice provisions, requiring that the Targeted Employees provide some amount of notice to Gallagher before leaving.  The amount of advance notice varies.  Of the 35 Targeted Employees that executed Agreements, 33 Agreements contain express notice provisions, and 27 Agreements require a notice period of at least 21 days before an employee leaves.  Importantly, for each of the 33 Agreements with notice provisions, the Targeted Employee was contractually obligated to provide some form of advance notice to Gallagher, a Delaware corporation, before leaving.

62.     Finally, most of the Targeted Employees acknowledged, pursuant to their Agreements, that they had a fiduciary duty to Gallagher to "devote [their] full energies, abilities, attention and business time to the performance of [their] employment obligations and responsibilities."  Accordingly, they would not:

> engage in any activity which conflicts or interferes with,
> or in any way compromises, his performance of those

> obligations and responsibilities. . . . Employee will not, either during or outside normal business hours, directly or indirectly sell, solicit, service, manage or engage in any aspect of the insurance, benefits or wealth management businesses for or on behalf of any person or entity other than the Company, nor engage in any activity that is not in the best interests of the Company.

63.     For its part, Alliant knew or should have known about the terms and conditions of these Agreements.  They aligned, at all relevant times, with industry norms and, as found in the Lockton Opinion, Alliant itself used similar language in its very own employment agreements.[6]

64.     Additionally, the plain language of the Agreements themselves required the Targeted Employees to provide Alliant with their Gallagher Agreements prior to starting at Alliant:

> Before accepting any new employment in the insurance, benefits or wealth management industries, Employee promises to give his prospective new employer a copy of this Agreement.  Employee permits the Company to advise any prospective new employer of Employee of the existence and terms of this Agreement and to provide it with a copy.

---

[6]     In the Lockton Opinion, Vice Chancellor Laster also noted that Alliant obtained copies of the Lockton employment agreements of the targeted employees and had outside counsel review them: "Through this process, Alliant learned about restrictive covenants that bound [the targeted employees], including restrictions on soliciting Lockton customers, soliciting Lockton employees, and using Lockton confidential information.  Alliant also understood that the [producer targeted employees] had to give thirty-days prior written notice before terminating their employment."  *See Lockton*, 2019 WL 2536104, at *4.

65.     At the very least, Alliant certainly knew or should have known about the terms and conditions of these Agreements once Gallagher sent correspondence to Alliant in March 2020 notifying Alliant of Ghirardini's restrictive covenants.

66.     But, consistent with its Playbook, Alliant ignored the Agreements and has been conducting its raid against Gallagher in clear violation of the terms set out in the Agreements and used throughout the insurance brokerage industry, including by Alliant itself.   Indeed, during a recent phone call, a Gallagher manager expressly told a recruiter acting on behalf of Alliant about the Non-Solicitation Clauses in his Agreement.   The recruiter told the Gallagher manager not to worry about it; Alliant did "not have the same perspective."

**C.      Alliant's Full-Court Press On Gallagher**

67.     Since at least late 2019, Alliant has engaged in an ongoing raid against Gallagher across the United States.   Gallagher's investigation and efforts to proactively uncover Defendants' actions remain ongoing and, as of the date of this Complaint, information continues to roll in about new producers and employees that Alliant is targeting.

68.     In January 2019, in preparation for additional hostile raid activity, including its raid on Gallagher, Alliant, while it was still a Delaware corporation, raised significant additional capital, funded by Stone Point and another investment manager.   Tom Corbett, Chairman and CEO of Alliant, said that the investment

would allow Alliant to "enter this exciting new stage in our growth strategy." And Jim Carey, Senior Principal at Stone Point and an Alliant Board member, said that the increased investment would allow Alliant to continue with its "next phase" of growth.

69.    Having secured the necessary funding, Alliant's raid of Gallagher's business appears to have started in or around December 2019.  On December 11, 2019, Michael Machette, a producer and Targeted Employee in Gallagher's San Francisco office who sold his business to Gallagher in 2008, executed a PEDP, indicating that he was in discussions with Alliant regarding potential employment:



70.    On January 29, 2020, exactly three weeks after this Court entered the Lockton Injunction, Alliant filed a Certificate of Conversion with the Delaware Secretary of State to convert Alliant to a California corporation, effective January 31, 2020.  The Certificate of Conversion states it was "approved in accordance with the provisions of 266 of the DGCL," which reasonably would have required a resolution by Alliant's Board of Directors, including Stone Point's three principals.

71.     Given the severity of the Lockton Injunction, it is clear that Alliant filed the Certificate of Conversion in order to avoid any future exposure to judicial scrutiny in Delaware, whose courts have already found Alliant's actions to be unlawful, and in order to *facilitate its ongoing raid* against Gallagher (and other competitors).   Alliant planned to, and did, use its filing of the Certificate of Conversion as a basis to induce the Targeted Employees to breach their Agreements.   Alliant did this by assuring the Targeted Employees—and even current Gallagher employees that have recently been solicited—that Alliant has a way to get around Gallagher's Non-Solicitation Clauses and that the employees were "*not to worry*."   The filing of the Certificate of Conversion, moving out of Delaware and into California—a state that has not, like Delaware, already determined that Alliant's actions are clearly unlawful—is one of the ways Alliant seeks to avoid the Non-Solicitation Clauses governing the Targeted Employees. Alliant's conversion to a California corporation was an integral part of Defendants' Playbook for the Gallagher raid.

72.     Around the same time, in late 2019 or early 2020, Don Tarantino, another producer and Targeted Employee in Gallagher's San Francisco office who sold his business to Gallagher in 2006, reached out to a current Gallagher employee and asked her what Gallagher paid her and others in the office.   The woman provided her own salary, which was not publicly available (she did not

know her co-workers' salaries), and Tarantino replied that she was "grossly underpaid" at Gallagher.  Months later, using the information Tarantino acquired while working for Gallagher, the woman received an offer letter from Alliant that included a 12% pay bump and an offer to work from home three days a week, which just so happened to match her work-from-home arrangement with Gallagher.

73.    In accordance with the Playbook, after months of preparation with certain of the Targeted Employees, Alliant began publicly executing its raid in March 2020.  While the rest of the world hunkered down to cope with the worldwide COVID-19 pandemic, Alliant continued its ongoing scheme to poach Gallagher's employees and clients across the United States.

74.    Initially, three of Gallagher's valuable Florida-based employees left Gallagher for Alliant.  At 6:34 p.m. on March 12, 2020, after fourteen years of service to Gallagher, David Ghirardini, a producer and Targeted Employee in Gallagher's West Palm Beach, Florida office, abruptly resigned.  On March 13, 2020, a Targeted Employee who worked with Ghirardini resigned, effective March 15, 2020.  On March 27, 2020, yet another Targeted Employee who worked with Ghirardini resigned, effective April 17, 2020 (though she stopped working before that).

75.    Following the initial two resignations in Florida, on March 17, 2020, Peter Carpenter, Alliant's Chief Operating Officer, contacted Gallagher and "offered" to purchase a number of the accounts that Ghirardini serviced while at Gallagher.  During the call, Carpenter identified specific accounts and information about those accounts that could only have been obtained from Ghirardini. Gallagher informed Carpenter that the business was not for sale.  On March 20, 2020, Gallagher formally responded to Alliant's offer in writing:

> Peter,
>
> I've talked it over with our FL leadership team and they're not interested in selling any of Dave's book to Alliant.  Please understand that if you all encourage Dave and Ken to violate their employment agreements, we will take legal action.

Carpenter responded: "Noted and *will be remembered*."

76.    Undeterred by Gallagher's rejection of Carpenter's proposition, Alliant actively targeted Gallagher's clients with Ghirardini's assistance, in clear violation of his Agreement.  To date, Alliant has illegally acquired nine of the Gallagher clients formerly serviced by the Florida-based Targeted Employees and continues, through Ghirardini to solicit others.

77.   On April 24, 2020, Gallagher Benefits Services, Inc., a subsidiary of Gallagher, brought suit against Ghirardini and Alliant in Palm Beach County, Florida, seeking temporary and permanent injunctive relief.[7]

78.   Having made quick work of the attack in Florida and unfazed by Gallagher's lawsuit, Alliant proceeded apace.  In mid-July 2020, Alliant executed the mass resignation of ten employees from Gallagher's San Francisco, California office in a period of days.  On July 13, 2020, Tarantino and another Targeted Employee who worked closely with him tendered their resignations, effective immediately.  The same day, Tarantino's two sons, who also worked in the office, tendered their resignations, effectively immediately.  Six other employees quickly followed.  All of them tendered their resignations effective immediately.

79.   Then, on July 27, 2020, producer Machette and another San Francisco-based Targeted Employee tendered their resignations, effective immediately.  They, too, went to Alliant.  In total, sixteen employees have left Gallagher's San Francisco office for Alliant, fifteen of whom left in just two

---

[7]   The litigation in Florida has moved slowly.  For example, on May 7, 2020, Alliant moved to disqualify the trial judge, which was denied and then appealed. During the pendency of the appeal, the trial judge was deprived of jurisdiction over the litigation.  Alliant has also stonewalled discovery.  Although the Court granted expedited discovery (over Alliant's objection), Alliant has, to date, refused to produce a single document.  The parties are now waiting on an order from the trial judge on Alliant and Ghirardini's motion to dismiss.  Thus, Gallagher has not been able to obtain timely and effective relief as against Alliant in Florida.

weeks.   After starting at Alliant, these employees immediately began (either directly or indirectly) to solicit the Gallagher clients they previously serviced.  As a result of its efforts in California, Alliant has illegally acquired over fifty of Gallagher's clients to date.

80.    On August 7, 2020, Gallagher brought suit against the San Francisco-based Targeted Employees and Alliant in the U.S. District Court for the Northern District of California for their illegal conduct.

81.    Alliant was far from done.  On August 11, 2020, just days after Gallagher sued Alliant (for the second time) for its illegal attacks, Alliant raided Gallagher's office in Dallas, Texas.  Alliant once again focused on three producers managing large books of business and strong teams of Gallagher employees: Steven Pierce (real estate and construction); Frank Albrecht (construction); and Todd Burke (PestSure, a pest control insurance "captive").  All three of the Dallas-based producers resigned, and others followed soon thereafter.  Within two-and-a-half weeks, nineteen Dallas-based Targeted Employees left, only one of whom provided any advance notice, and began working at Alliant immediately.

82.    Alliant and the Dallas-based Targeted Employees have already conspired and arranged for scores of Gallagher clients to transition their business from Gallagher to Alliant.

83.   On August 13, 2020, Gallagher filed suit against some of the Dallas-based Targeted Employees and Alliant in Collin County, Texas, seeking a temporary and permanent injunction.  That case is currently stayed awaiting ruling on a recusal motion.

84.   As of the date of this Complaint, Alliant's raid on Gallagher is ongoing.

85.   On Monday, August 24, 2020, the Area President of Gallagher's Atlanta, Georgia office received an email from a recruiter at the Ramsey Search Group.  The recruiter identified himself as someone who was reaching out on behalf of Alliant.  In his initial correspondence with the Gallagher manager, the recruiter expressly acknowledged Alliant's desire and intent that the Gallagher manager breach his obligations to Gallagher in order to join Alliant:

> I hope you enjoyed your weekend, I wanted to follow up on a previous email I sent you about an opportunity we have with a large national brokerage.
>
> They are looking for seasoned, self-sustaining producers with a sizable book that they want to come over with you.  99% of the producers I speak with have a non-compete and your current employer is not in the business of selling books of business and you are probably dubious as to how you book of business would be able to follow you.  All I can tell you is that my client has been very successful at making this happen.  They are offering a very sizable transition salary and stock to make the move.

86.   In follow-up email correspondence, also on August 24, 2020, the recruiter confirmed: "My client is Alliant Insurance and the *comp is based on the size of book you would be able to bring with you*."

87.    During a phone call on August 25, 2020, the recruiter asked the Gallagher manager about the size of his book of business and told him that Alliant is looking for and trying to target producers with large blocks of business (on the low end, between $700,000 and $1 million).  The recruiter reiterated that Alliant's offer was 100% contingent on moving clients from Gallagher to Alliant.  The recruiter said that the compensation package would be structured in such a way that the total compensation increased depending upon the amount of client revenue the Gallagher manager brought with him, further inducing him to breach his Agreement with Gallagher and the Non-Solicitation Clauses therein in order to get paid more money.

88.    When the Gallagher manager inquired about the Non-Solicitation Clauses in his Agreement, which clearly prohibit him from soliciting and moving Gallagher clients to a new employer, the recruiter, referring to the Playbook, told him that Gallagher and Alliant "***do not have the same perspective***" on the Non-Solicitation Clauses and that Alliant has been "***extremely successful*** in making this happen."

89.    Most recently, the Gallagher manager had an hour-long call with Tim Ward, Alliant's Senior Vice President of Business Development.  Ward was hired in May 2015, right around the time Stone Point acquired majority ownership of

Alliant.[8]  During a September 3, 2020 call, Ward characterized himself as the architect of Alliant's "leveraged" buyout scheme and, consistent therewith, focused the conversation on the size (*i.e.*, annual revenue) of the Gallagher manager's book of business and his ability to transition those clients to Alliant.  In addition, Ward spent time discussing Tom Corbett, Alliant's CEO, and his "direct line" to Stone Point and the many benefits associated with access to that type of capital.  Ward explained that Stone Point and Alliant coordinate closely to ensure that Alliant has the cash and stock needed to execute its targeted slate of leveraged hires.  Defendants' solicitation of Gallagher employees like the one who spoke to Ward remains ongoing, with the focal point remaining on stealing business away from Gallagher.

90.  **Figure 2** below provides an overview of the departures of the Targeted Employees to date.  Of the 39 Targeted Employees, 32 left immediately without notice, 26 of whom used the exact same words in their departure emails or letters: "effective immediately."  One Targeted Employee expressly stated she was resigning "effective immediately *without notice*," despite the fact that her Agreement clearly provided she had to give 21 days' notice and had certain

---

[8]    In a May 14, 2015 press release announcing the new hire, Peter Carpenter, Alliant's Chief Operating Officer, noted: "Alliant is expanding its reach across all facets of the business, and Tim will lead the charge and bring top producers to our talented brokerage team."

obligations to Gallagher during that notice period.  Indeed, most of the Targeted Employees resigned "effective immediately" even though their Agreements made clear that they had to give at least some notice to Gallagher, a Delaware corporation, before leaving.  The Targeted Employees executed their departures in a remarkably organized and methodical manner—a strategic move that is lifted directly from the Playbook.

91.    Indeed, some of these Targeted Employees sent their resignation notifications within minutes of each other.  In San Francisco, Targeted Employees Salvatore Tarantino and Taylor Tarantino resigned at the exact same minute—9:39 a.m. (approximately two-and-a-half hours after their father, producer and Targeted Employee Don Tarantino, tendered his resignation).  Likewise in Texas, Targeted Employees Kristina Phillips and Gretchen Lambourne resigned within two minutes of each other (12:01 p.m. and 12:03 p.m., respectively), while Targeted Employees Maria Maldonado and Sierra Maldonado resigned within just ten minutes of each other (8:31 a.m. and 8:41 a.m., respectively).  The departures where synchronized and systematic, and in many instances constituted clear breaches of the Targeted Employees' Agreements, which required that sufficient notice be provided to Gallagher before the employees left (in most instances, 21 days).

92.    **Figure 2** below provides a timeline of the departures of the Targeted Employees to date.

**Figure 2.  Timeline Of The Targeted Employees' Departures**

| No. | Name (P / E)[9] | Office | Date | Time | Departure Date |
|-----|-----------------|--------|------|------|----------------|
| 1 | David Ghirardini (P) | Fla. | 3/12/2020 | 6:34 PM | "Effective immediately" |
| 2 | Ken Evelyn (E) | Fla. | 3/13/2020 | -- | Effective 3/15/2020 |
| 3 | Cheryl Lonergan (E) | Fla. | 3/27/2020 | 9:03 AM | Effective 4/10/2020 |
| 4 | Bilal Ashraf (P) | NJ | 7/5/2020 | 6:41 AM | "Effective immediately" |
| 5 | Don Tarantino (P) | Calif. | 7/13/2020 | 7:02 AM | "Effective immediately" |
| 6 | Salvatore Tarantino (E) | Calif. | 7/13/2020 | 9:39 AM | "Effective immediately" |
| 7 | Taylor Tarantino (E) | Calif. | 7/13/2020 | 9:39 AM | "Effective immediately" |
| 8 | Bernadette Heater (E) | Calif. | 7/13/2020 | 12:21 PM | "Effective immediately" |
| 9 | John Quinlan (E) | Calif. | 7/14/2020 | 7:50 AM | "Effective immediately" |
| 10 | Elsa Wong (E) | Calif. | 7/14/2020 | 1:56 PM | Effective 7/15/2020 |
| 11 | Brian Selna (E) | Calif. | 7/14/2020 | -- | "Effective immediately" |
| 12 | Michelle Zabit (E) | Calif. | 7/17/2020 | 6:42 PM | "Effective, July 17th at 5 pm" |
| 13 | Jacklyn Concannon (E) | Calif. | 7/20/2020 | -- | "Effective July 20, 2020" |
| 14 | Craig Hamakawa (E) | Calif. | 7/22/2020 | 4:05 AM | Effective 7/30/2020 |
| 15 | Michael Machette (P) | Calif. | 7/27/2020 | 7:22 AM | "Effective immediately" |
| 16 | Spencer Brush (E) | Calif. | 7/27/2020 | 7:57 AM | "Effective immediately" |
| 17 | Robyn Demchak (E) | Calif. | 7/27/2020 | -- | Effective 8/7/2020 |
| 18 | Lisa Kavanagh (E) | Calif. | 7/28/2020 | 8:00 AM | "Effective immediately" |
| 19 | Jared Finney (E) | Calif. | 7/28/2020 | 9:17 AM | "Effective immediately" |
| 20 | Steve Pierce (P) | Tex. | 8/11/2020 | 9:28 AM | "Effective immediately" |

---

[9]     "P" stands for producer; "E" stands for employee.

| No. | Name (P / E)[9] | Office | Date | Time | Departure Date |
|-----|------------------|--------|------|------|----------------|
| 21 | Todd Burke (P) | Tex. | 8/11/2020 | 11:00 AM | "Effective immediately" |
| 22 | Kristina Phillips (E) | Tex. | 8/11/2020 | 12:01 PM | "Immediate effect" |
| 23 | Gretchen Lambourne (E) | Tex. | 8/11/2020 | 12:03 PM | "Effective immediately and without notice" |
| 24 | Frank Albrecht (P) | Tex. | 8/11/2020 | 12:11 PM | Effective 9/1/2020 |
| 25 | Cindy Perkins (E) | Tex. | 8/11/2020 | 1:26 PM | "Effective immediately" |
| 26 | Linda Midyett (E) | Tex. | 8/11/2020 | 1:52 PM | "Immediate resignation" |
| 27 | Amanda Ruemke (E) | Tex. | 8/12/2020 | -- | "Effective immediately" |
| 28 | Derek Conway (E) | Tex. | 8/12/2020 | 10:36 AM | "Effective immediately" |
| 29 | Cheri Veltman (E) | Tex. | 8/12/2020 | 12:45 PM | "Effective immediately" |
| 30 | Abby Thalachelloor (E) | Tex. | 8/13/2020 | 12:02 PM | "Effective immediately" |
| 31 | Clay Williams (E) | Tex. | 8/13/2020 | 4:14 PM | "Immediate resignation" |
| 32 | Brandi Price (E) | Tex. | 8/13/2020 | 5:13 PM | "Effective immediately" |
| 33 | Maria Maldonado (E) | Tex. | 8/14/2020 | 8:31 AM | "Effective immediately" |
| 34 | Sierra Maldonado (E) | Tex. | 8/14/2020 | 8:41 AM | "Effective immediately" |
| 35 | Rosemary Bruscino (E) | Tex. | 8/14/2020 | 2:30 PM | "Effective immediately" |
| 36 | Eileen Hand (E) | Tex. | 8/14/2020 | 4:09 PM | "Please accept this email as notice of my resignation" |
| 37 | Theresa Graf (E) | Calif. | 8/21/2020 | -- | Effective 9/4/2020 |
| 38 | Pamela Tyrone (E) | Tex. | 8/27/2020 | 7:30 PM | "Effective immediately" |
| 39 | Trinita Washington (E) | Tex. | 8/28/2020 | 8:00 AM | "Effective immediately" |

**D.**      **Defendants' Known Bad Acts To Date**

93.      Gallagher's investigation into the circumstances of Defendants' raid on Gallagher remains ongoing, but, to date, Gallagher has uncovered numerous instances of misconduct and evidence of Defendants' improper and tortious acts, either by their own hands or by those of their agents.  In particular, Gallagher alleges at least the following:

(a)      On December 11, 2019, Michael Machette, a producer and Targeted Employee in San Francisco, executed a PEDP with Alliant while he was still working at Gallagher, signaling that he was in employment discussions with Alliant by at least that point.  On information and belief, each of the Targeted Employees was required to enter into a PEDP like the one signed by Machette with Alliant, and they began doing so in or around late 2019 (perhaps earlier).

(b)      For the next six months, Machette remained employed by Gallagher and owed fiduciary duties to Gallagher, including duties of candor and undivided loyalty.  Machette's Agreement specifically provides that he was required to "devote his entire business time and attention to the performance of the duties hereunder and to promot[e] the best interests of the Corporation and its subsidiaries."  Pursuant to the PEDP that Machette signed with Alliant, however, he—and, on information and belief, the other Targeted Employees—owed certain concomitant obligations and duties to Alliant.

(c)     Around late 2019 or early 2020, Don Tarantino, another Targeted Employee in San Francisco, asked a current employee in Gallagher's San Francisco office to disclose her confidential salary information as well as that of her co-workers.  The employee provided her own salary (she did not know her co-workers' salaries), to which Tarantino replied she was "grossly underpaid" at Gallagher.  After Tarantino went public with his move to Alliant on July 13, 2020, Alliant contacted the employee and offered her a job (without any interview) that paid at a 12% premium to her Gallagher salary and allowed her to work from home three days a week (the same arrangement she had with Gallagher).  There would be no way for Alliant to know this information without Tarantino (or another Targeted Employee) providing it.   Alliant obtained and used this information, which it would not otherwise have been able to access, in order to more effectively solicit the Gallagher employee.

(d)     On March 12, 2020, David Ghirardini, a producer and Targeted Employee in Gallagher's West Palm Beach, Florida, office, resigned "effective immediately."   When he left, Ghirardini provided an incomplete "transition worksheet," which included information on just one client assigned to him and did not include information for the other clients he serviced while at Gallagher. Immediately after, the missing clients were contacted and solicited by Alliant.

(e)   On March 17, 2020, Peter Carpenter, Alliant's Chief Operating Officer, contacted Gallagher and "offered" to purchase a number of the accounts that Ghirardini serviced while at Gallagher.  During the call, Carpenter identified specific accounts and information about those accounts.  Once again, the only way Carpenter could have known about these accounts and information was from Ghirardini.

(f)   On March 20, 2020, Gallagher's Regional President for the Southeast replied that Gallagher was not interested in selling Ghirardini's clients: "Please understand that if you all encourage Dave and Ken [Evelyn] to violate their employment agreements, we will take legal action."  Carpenter replied with an implied threat:  "Noted and will be remembered."

(g)   On March 21, 2020, Gallagher replied to Carpenter and said: "I see you're playing your usual games by stealing business since you can't grow organically any other way."  In response, Carpenter replied "Allow me to help you with some terms," and defined "[o]rganic growth" as "[h]iring and RETAINING excellent insurance professionals who produce business."  The opposite, Carpenter said, was "expensively buying every small firm that will say yes."  In short, Carpenter acknowledged that, as far as Defendants are concerned, "organic growth" means raiding Gallagher and other competitors for individuals who "produce business."  Carpenter's definition of "organic growth" also provides

further clarity into Stone Point's role with respect to Alliant, as a January 22, 2019 Stone Point press release acknowledged that it would support that same growth model: "Alliant is a premier specialty insurance brokerage business with industry-leading *organic growth*. We are looking forward to continuing with the company in the next phase of that growth."

(h)    On March 30, 2020, Gallagher learned that Ghirardini solicited a Gallagher client, an account he serviced when he was at Gallagher. This was one of the accounts that Carpenter had "offered" to buy on March 17, 2020, then threatened to take by force.

(i)    In April 2020, Alliant and Ghirardini solicited and successfully diverted six other Gallagher clients that Ghirardini had previously serviced to Alliant. During this time, Gallagher learned directly from a number of its clients that Ghirardini had reached out to them and encouraged them to move from Gallagher to Alliant, including one of the largest clients Ghirardini serviced for Gallagher. In the months since April, Alliant and Ghirardini have continued to solicit clients that Ghirardini serviced at Gallagher, and in that time, at least one additional account has left Gallagher as recently as August 25, 2020.

(j)    On July 5, 2020, Bilal Ashraf, a producer and Targeted Employee based in in New Jersey, resigned "effective immediately" and began to work for Alliant in violation of his contractual obligation to provide 21 days'

notice to Gallagher.  Similar to the other Targeted Employees, Ashraf's Agreement prohibits him from, among other things, soliciting Gallagher clients for a period of two years following his resignation.  Since Ashraf's resignation, Gallagher has received letters from three Gallagher clients that Ashraf serviced, notifying Gallagher that they were moving to Alliant.

(k)    In July 2020, one of the Tarantinos told a Gallagher client that its service manager, with whom it had a close relationship, would be joining Alliant.  That statement was inaccurate, but in reliance upon it, the client planned to move its business to Alliant.  Only upon learning that the service manager was not, in fact, joining Alliant did the client confirm that it would remain with Gallagher.  All three of the Tarantinos resigned from Gallagher on July 13, 2020, "effective immediately."

(l)    Bernadette Heater, who worked closely with Don Tarantino, began mass-emailing Gallagher's confidential information to her personal email account in the days leading up to her resignation from Gallagher.  These emails included, among other things:

(i)    Current Gallagher client lists, including information regarding the value of the clients' claims over the years, client contacts, and internal notes regarding particular clients' expectations and preferences;

47

(ii)    Internal Gallagher documents and strategies regarding client policy structuring, client premium reports, and extensive budget and other financial information regarding Gallagher's business; and

(iii)   Information related to client retention and renewal strategies.

(m)    More specifically, the files that Heater improperly sent to her personal email account, in direct violation of her Agreement and her duties to Gallagher—and, it is reasonable to infer, at the direction of Don Tarantino and on behalf of her new employer, Alliant—included, among other things, the following (in chronological order):

(i)    Gallagher's proprietary strategy for securing clients' renewal of insurance policies (sent on April 2, 2020);

(ii)   A document titled "clientreports" with an executive summary of claims for all lines of insurance coverage for an account that has since left Gallagher and moved to Alliant (sent on April 16, 2020);

(iii)  Renewal quotes and policies for a July 1, 2020 renewal for another valuable Gallagher client who has since left for Alliant (sent on May 6, 2020);

(iv)    The resume of a potential Gallagher recruit who Alliant then recruited (sent on June 1, 2020);

(v)     Historical insurance premium information for another valuable Gallagher client that has since left for Alliant (sent on June 5, 2020);

(vi)    A proprietary Gallagher client list, with client addresses, email addresses, and primary points of contact (sent on June 11, 2020);

(vii)   A proprietary Gallagher spreadsheet identifying certain Gallagher clients, carriers associated with those clients, premiums, policy numbers, expiration dates, and a description of coverage (sent on June 18, 2020);

(viii)  A list with critical contact information for Gallagher-assigned underwritings at insurance carriers working on Tarantino's accounts, including email addresses, phone numbers, and billing and audit contacts (sent on June 23, 2020); and

(ix)    Analyses of properties and premiums for yet another client that has since left for Alliant (sent on June 29, 2020).

(n)   Heater's Agreement specifically prohibited her from misappropriating Gallagher's confidential information.

(o)   Likewise, between April and July 2020, Spencer Brush, one of the Targeted Employees in San Francisco, who was also Machette's son-in-law and a co-worker at Gallagher, misappropriated information from Gallagher in the days leading up to July 27, 2020 (the day he and Machette both resigned "effective immediately").  The information Brush sent to his personal email address included confidential client contact and policy information.   Like Heater, Brush's Agreement specifically prohibited him from misappropriating Gallagher's confidential information.

(p)   In the months leading up to Don Tarantino's abrupt resignation on July 13, 2020, and while he still worked at Gallagher, Tarantino hosted golf outings and dinners in order to woo Gallagher's clients to Alliant, which he expensed to Gallagher.  Some of these were the very same clients Tarantino had sold to Gallagher years earlier.[10]

---

[10]   This was a clear violation of Tarantino's Agreement, which provides that he should "**_devote his entire business time and attention_**" to promoting the best interests of Gallagher, and prohibited him from "during or outside of normal business hours, directly or indirectly, sell, solicit, service-or engage in any aspect of the insurance business for or on behalf of any entity other than the Corporation and its subsidiaries, nor engage in any activity inimical to the best interests of the Corporation and its subsidiaries."

(q)    For example, between June 19-20, 2020, Tarantino charged Gallagher well over $1,000 to take two long-time clients out to golf at the Bay Club Stone Tree in Novato, California and dinners at Jason's Restaurant in Greenbrae, California, and Le Garage Bistro in Sausalito, California.  Around the same time, Heater sent an email to her personal email account that contained confidential information about the same two clients.  The purpose of Tarantino's outings that weekend, it is reasonable to infer, was to solicit business for Alliant, on Gallagher's dime.

(r)    Shortly after Tarantino and Heater resigned on July 13, 2020, a San Francisco-based Gallagher employee and member of Tarantino's team was contacted by a recruiter and told that she would be hired if she applied online for a job at Alliant.  The Gallagher employee applied and subsequently received an offer letter that included information that could have only been provided by Tarantino (or another Targeted Employee), including detailed information related to her compensation and the fact that she worked from home three days a week.  Months earlier, around December 2019 or January 2020 and while still working at Gallagher, Tarantino had asked the Gallagher employee about her compensation.

(s)    Between June 22-23, 2020, Cindy Perkins, one of the Dallas-based Targeted Employees, emailed a Gallagher HR Department representative to collect information on behalf of Alliant regarding certain Targeted Employees'

salary information, stating that Todd Burke, a producer and Targeted Employee in Dallas and Perkins' manager, asked her to confirm her salary and that of Eileen Hand and Abby Thalachelloor.  Perkins acknowledged that she had Hand's salary since she had just recently been hired, but needed her own salary and that of Thalachelloor.   Gallagher's HR representative responded on June 24, 2020, providing the salary information for Perkins and Thalachelloor.

(t)   Perkins and Burke resigned on August 11, 2020 (both, "effective immediately").  Thalachelloor resigned on August 13, 2020 and Hand resigned August 14, 2020.

(u)   Following the July 13, 2020 resignations of Don Tarantino and Heater (along with Tarantino's two sons), a San Francisco-based Gallagher employee called Heater to discuss Heater's resignation.  During the call, Heater solicited the Gallagher employee, telling her to go to Alliant's website and apply for a job.  The Gallagher employee submitted her resume, applied online, and— within minutes—received a phone call from an Alliant employee in New York City, who told her that Alliant was glad she applied and made her an offer *on the spot*, which included a raise and a bonus above what she was then being paid at Gallagher.

(v)   In the days following Heater's departure, and in an effort to disguise her solicitations of the Gallagher employee in clear violation of her

Agreement, Heater communicated with the Gallagher employee, but did so on *her husband's phone*.

(w)    Within days of the July 13, 2020 departures in San Francisco, the same clients that had been golfing and dining with Don Tarantino at Gallagher's expense between June 19-20, 2020 *abruptly terminated* their business relationship with Gallagher and switched to Alliant.

(x)    For approximately two weeks after they left Gallagher, Salvatore and Taylor Tarantino did not return their Gallagher-issued laptops, which contained Gallagher's valuable and confidential information regarding clients and business strategies.  The brothers finally returned the devices on July 30, 2020.

(y)    On or around July 9, 2020, a producer in Gallagher's District of Columbia office received a LinkedIn message from a recruiter acting on behalf of Alliant.  After an initial conversation with the recruiter, on or around July 28, 2020, the Gallagher producer had an hour-long video conference with Alliant executives Michael Cusak and Peter Arkley.

(z)    During that conversation, Cusak and Arkley asked the Gallagher producer about his area of specialty within the property and casualty space and about the size of his book of business.  Following this discussion, the Gallagher producer was contacted by Bledion Dizdari, First Vice President of Operations and Finance at Alliant.  During this call, Dizdari walked the Gallagher

producer through a proposed compensation term sheet.  To incentivize him to leave Gallagher and bring its client to Alliant, the term sheet provided the Gallagher producer with: (i) a two-year guaranteed base annual salary; (ii) a signing bonus; (iii) another substantial bonus at his year-one anniversary, but only if the Gallagher producer's book of business was in excess of a threshold level of annual revenue; (iv) an annual commission bonus of 30% of the commissions Alliant received, but only after the book of business was in excess of another threshold level; and (v) a number of equity stock options that vested over various periods of time.  Dizdari emphasized that the equity offer was significant due to Alliant's private equity backing (*i.e.*, from Stone Point).  Specifically, Dizdari noted that the offer of $50,000 in equity was likely to be worth significantly more when Stone Point eventually sold Alliant.

(aa)   During the call, the Gallagher producer observed that a number of the bonuses were only triggered once he had reached a certain threshold book of business.  The Gallagher producer asked how this would be possible in light of his Agreement with Gallagher, which contained the usual Non-Solicitation Clauses preventing him from soliciting existing clients for a period of two years.  Dizdari confirmed that the offer was contingent upon the Gallagher producer immediately moving a sizeable portion of Gallagher's clients to Alliant, but that—***not to worry***—Alliant and its attorneys would walk him through the process.

(bb)   When the Gallagher producer pressed further about the Non-Solicitation Clauses in his Agreement, Dizdari noted that Alliant has discovered that clients are much less likely to move their business after the end of a two-year non-solicit runs and therefore wants—and demands, in order to get paid—that the business be moved *immediately*.  Upon learning that this was how the deal was structured (*i.e.*, he would have to breach his Agreement), the Gallagher producer declined the offer.

(cc)   On July 20, 2020, Cindy Perkins, the Dallas-based Targeted Employee discussed earlier, forwarded to her personal email account a large Excel spreadsheet containing detailed confidential information about Gallagher clients related to large loss-insurance claims.[11]

(dd)   On July 22, 2020, Michael Machette, the producer and Targeted Employee from San Francisco discussed earlier, received an official offer letter from Alliant, which expired on Friday, July 24, 2020.  Even though he accepted the Alliant job offer that Friday, Machette did not resign from Gallagher until the following Monday, July 27, 2020—which also happened to be the start date listed in his Alliant offer letter.  This behavior closely tracks Lockton, where "Alliant initially targeted Friday, March 8, 2019 for the walkout, then decided that the date

---

[11]     In addition to the July 22 email, Perkins forwarded Gallagher confidential client documents to her personal email account on June 11, 18, 19, and 30.

should be moved to Monday, March 11, because '[*i*]*f the resignations happen Friday, Lockton will have all weekend to prepare litigation strategy before the new hires are able to bring in business*.'"  *Lockton*, 2019 WL 2536104, at *7 (emphasis in the original).

(ee)   On August 11, 2020, a large client of Gallagher that Todd Burke, the producer and Targeted Employee in the Dallas office discussed above, serviced, emailed Gallagher's Area President, stating: "Effective immediately, PestSure is moving the administration of the captive from Arthur J. Gallagher to Alliant Insurance Services. . . . In addition, please provide Alliant with all PestSure Association ("PestSure") documents that are kept in Todd Burke's office, including all board books, as well as any backups of the share drive in Kristina Phillips' office."  There is no way PestSure would have known about the exact whereabouts of these materials in Burke's office at Gallagher unless PestSure had been contacted directly by Burke, or by Alliant on Burke's behalf.

(ff)   PestSure is a captive insurance company that is owned and controlled by its insureds, which are other pest-control companies.  PestSure entered into a compensation agreement with Gallagher, effective February 1, 2007, which was most recently amended on January 1, 2013 (the "Compensation Agreement").  The Compensation Agreement obligated PestSure to pay Gallagher fees for certain brokerage and administrative services that Gallagher provided to

the captive.  Over the duration of the Compensation Agreement, PestSure paid these fees to Gallagher.

(gg)   Alliant knew or should have known about the existence of the Compensation Agreement, as it is standard in the industry to enter into such agreements with captive clients.  Alliant's wrongful and intentional actions, which included poaching Todd Burke and his team from Gallagher and working clandestinely to solicit PestSure's business—in part by misappropriating confidential information about Gallagher's relationship with PestSure—caused PestSure to terminate its relationship with Gallagher on August 11, 2020.

(hh)   Additionally, in February 2007, at the time it entered into the Compensation Agreement with PestSure, Gallagher entered into a general agency agreement with an insurance carrier to market the carrier's policies to members of the PestSure association in exchange for commission fees.  On July 30, 2020, while he was still working for Gallagher, Burke received an email from a Senior Vice President of Operations at the insurance carrier, asking if the President of PestSure's Board of Directors was going to call him.

(ii)   As recently as September 2, 2020, the insurance carrier was emailing Burke about entering into a new general agency agreement with Alliant, having terminated the relationship with Gallagher.  In his email, the insurance carrier references a prior draft of the new general agency agreement with Alliant,

dated August 13, 2020, two days after Burke left Gallagher.  If not for Burke's solicitation, which violated the terms of his Agreement with Gallagher, the insurance carrier would not have terminated its relationship with Gallagher.

(jj)    Clay Williams, a Targeted Employee in Dallas and member of Burke's, told Gallagher that immediately after Burke left, but prior to receiving an offer to apply for a job at Alliant, "they" told him to sit tight and that an offer from Alliant would be coming shortly, which it soon did.

(kk)   On or about August 11, 2020 (the same day that Targeted Employee Steve Pierce resigned), one of Gallagher's clients told a Gallagher employee that she already knew that Pierce had joined Alliant because an Alliant employee called her and told her.  On the same call, the Gallagher client asked whether the Gallagher employee would be leaving to go and work for Alliant as well.

(ll)    On the evening of August 12, 2020, the day before she resigned, Amanda Ruemke, another Targeted Employee and member of Steve Pierce's team in Dallas, misappropriated Gallagher's confidential information by emailing it to her personal Gmail account.  This information included: (i) a proprietary administration training manual, which contained a veritable roadmap for Pierce and his team to learn the inner workings of Gallagher's client programs so they could immediately service those accounts at Alliant; and (ii) a project list

58

for a Gallagher client.  The manual contains, among other things, contacts of all contractors, administrative processes of all parties, and communications with and the historical context of a client.  The project list included detailed contact information for the Gallagher client.

(mm) Most egregiously, Gallagher recently found out that, on or about August 25, 2020, Alliant sent a client (who has since returned to Gallagher) a Controlled Insurance Program Manual ("CIP Manual") that contains 23 pages of material that was lifted directly from a Gallagher CIP Manual, which Alliant appears to have "rebranded" as its own.  In rebranding the CIP Manual, Alliant **almost** always remembered to edit the document from "Gallagher" to "Alliant" in order to cover its tracks, as shown by the redline below:



But in several instances, Alliant forgot:

SECTION 6 - AJG/WRAPX ONLINE PORTAL INSTRUCTIONS ...........

Sample Certificate of Insurance  (Enrolled Subcontractors).............................

**CCIP Client Service Manager**
Representative from Arthur J. Alliant & Co.

(nn)   On August 13, 2020, Dallas-based Targeted Employee Abby Thalachelloor resigned from Gallagher by sending her manager, Sharon Manwaring, an email at 12:02 p.m.  In the hours leading up to her resignation on the morning of August 13, Thalachelloor accessed a number of Gallagher's documents, including an Excel spreadsheet titled "Large Loss Spreadsheet.".  The excel contains confidential information regarding Gallagher's clients and their detailed claims information.  Thalachelloor also installed a USB flash disk external storage device on July 28, 2020.  That USB flash disk external storage device was subsequently inserted on July 30, August 3, August 6, and August 10, 2020.  During this time, activity was logged associated with the USB flash disk external storage device.

(oo)   Also on August 13, 2020, Brandi Price, the Dallas-based Targeted Employee discussed earlier, resigned from Gallagher, "effective immediately."  Like most of the other Targeted Employees, Price was required to provide 21 days' notice to Gallagher.  The evening before she resigned, Price

inserted and installed a USB flash drive external storage device.  This appears to have been the first time Price ever used such a device on her Gallagher-issued device.  The day before she resigned, Price also deleted more than 109 documents from her Gallagher-issued device, including documents with titles relevant to the Gallagher clients that were improperly solicited by Alliant and the Targeted Employees and have since switched to Alliant (*e.g.*, document titled "20-21 PestSure Renewal Proposal").

(pp)   In the late afternoon on August 13, 2020, Targeted Employee Eileen Hand, discussed above, forwarded an email titled "Orientation" from her personal Yahoo email account to her Gallagher email account.  Attached to the "Orientation" email, which was otherwise blank, was Hand's completed application for employment at Alliant, a PEDP, other HR documents, and Hand's CV.  Despite having only submitted an application for employment at Alliant on or about 3:30 p.m. on August 13, 2020, Hand was purportedly interviewed, given an offer, accepted her employment at Alliant, and provided her resignation to Gallagher within approximately twenty-four hours.  Hand resigned at 4:09 p.m. on August 14, 2020.

(qq)   On August 25, 2020, Targeted Employee Bernadette Heater, discussed above, emailed a Gallagher client providing detailed instructions "[t]o process the Broker Change" (*i.e.*, issue a broker of record letter ("BOR") moving

from Gallagher to Alliant).  Heater attached a draft BOR and told the Gallagher client to transfer the draft she circulated to the client's letterhead and "date, complete, sign and return."  Heater also instructed the Gallagher client that Alliant "request[s] you send an email with the following to Gallagher: *Thank you for your time and service while partnering together over the last few years.  We have made the decision to switch our brokerage partner to another firm.  Please send us the current insurance certificate holder list.  We wish you the best*."  Finally, Heater instructed the Gallagher client to then forward the sent email back to her "along with any other policy information Gallagher sends you."

(rr)    On August 28, 2020, Trinita Washington and Pamela Tyrone, Targeted Employees who were also both members of Burke's PestSure team, resigned from Gallagher "effective immediately" (despite the fact that he was contractually obligated, under his Agreement, to provide 21 days' notice to Gallagher).  Washington's and Tyrone's resignations happened after Gallagher had already filed suit in Collin County, Texas.  As discussed above, Alliant certainly knew about the terms of these Agreements, yet it continues to interfere with them, pressing Gallagher employees to violate the Agreements.

(ss)    On August 24, 2020, an Area President of Gallagher's Atlanta, Georgia office received an email from a recruiter at the Ramsey Search Group, who said he was reaching out on behalf of Alliant.  In his initial correspondence

with the Gallagher manager, the recruiter expressly acknowledged Alliant's desire and intent that the Gallagher manager breach his obligations to Gallagher to join Alliant.  In follow-up email correspondence, also on August 24, 2020, the recruiter confirmed: "My client is Alliant Insurance and the comp is based on the size of book you would be able to bring with you."

(tt)     During a phone call on August 25, 2020, the recruiter asked the Gallagher manager about the size of his book of business and told him that Alliant is looking for and trying to target producers managing large blocks of business (on the low end, between $700,000 and $1 million).   The recruiter reiterated that Alliant's offer was 100% contingent on moving clients from Gallagher to Alliant. When the Gallagher manager inquired about the Non-Solicitation Clauses in his Agreement with Gallagher, the recruiter told him that Gallagher and Alliant "do not have the same perspective" on the Non-Solicitation Clauses and that Alliant has been "extremely successful in making this happen," referring to bringing employees and clients over from competitors.

(uu)    On September 3, 2020, the Gallagher manager spoke with Tim Ward, Alliant's Senior Vice President of Business Development, who was hired around the time Stone Point acquired Alliant.  During an hour-long phone call, Ward specifically focused on the Gallagher manager's ability to bring over Gallagher clients to Alliant.  Ward also emphasized, in the recruiting call, that

Alliant's CEO, Tom Corbett, had a direct line to Stone Point and that Stone Point and Alliant coordinate closely to ensure that Alliant has the cash and stock needed to execute its targeted slate of leveraged hires.

(vv)   On September 14, 2020, the same recruiter from Ramsey Search Group discussed above (*see supra* ¶ (ss)-(tt)), emailed a Gallagher area vice president in Gallagher's Lubbock, Texas office.  In his email, the recruiter noted that Ramsey Search Group has "recently partnered with a large national agency *that is making a strong push in 2020 to bring on new producers*."  The recruiter went on to state that "after building a book of business it does not usually make sense to walk away but *my client has been extremely successful at allowing the producer to bring their book with them*."

(ww)  Gallagher's investigation into the circumstances of Defendants' bad acts remains ongoing.

## IV.   IRREPARABLE HARM TO GALLAGHER

94.     Gallagher has suffered, and will continue to suffer, irreparable harm if Defendants are allowed to continue exploiting and profiting off the ill-gotten competitive advantage obtained by inducing the Targeted Employees to breach their contractual obligations and duties to Gallagher and steal Gallagher's confidential information.

95.     Gallagher expends considerable time, effort, and resources to develop and market their products and services.  In addition, Gallagher, through internal programs, provides its producers and employees with extensive training, coaching, and education regarding Gallagher's products and services as well as best practices for client pitching, service, and retention.  Gallagher also supports and pays for marketing and advertising opportunities as well as client entertainment to allow its trusted producers to further enhance relationships and goodwill.  As such, Gallagher makes significant investments in its producers and employees and their career development and growth at Gallagher.

96.     Finally, Gallagher invests significant resources in its clients. Gallagher's retail brokerage teams are built in such a way that they specialize in targeted areas of business and/or industries, so that the Gallagher team has a depth and breadth of expertise in the client's industry and can offer specialized knowledge and understanding specific to each client.  Gallagher's specialized focus on niche practice groups, allows it to highly-focus its marketing efforts and facilitates the development of value-added products and services specific to the client's industry.  Due to this rich understanding of the client's industry and devotion to client service and building relationships, one of the greatest avenues for growth for Gallagher is the ability to cross-sell other brokerage products to existing clients.

97.     In recognition of the inherent and unique value of these resources and assets, Gallagher's Agreements—including those signed by the Targeted Employees—contains a provision in which the Gallagher employee recognizes and agrees that:

(a)     it would be difficult to measure precisely the damages to Gallagher from any breach by an employee of his or her Agreement to abstain from soliciting Gallagher clients, soliciting Gallagher employees, providing adequate notice, and misappropriating Gallagher's confidential information;

(b)     injury to Gallagher from any such breach (*i.e.*, solicitation of Gallagher clients and/or employees, inadequate notice, and misappropriation of confidential information) would be incalculable and irremediable; and

(c)     money damages would therefore be an inadequate remedy for any such breach.

98.     Based upon these acknowledgements, the Targeted Employees agree that "in addition to any other remedy [Gallagher] may have at law or in equity, [Gallagher] will be entitled to enforce this Agreement by obtaining a temporary restraining order and preliminary and permanent injunctive relief to restrain any such breach or further breach by Employee."

99.    Since Alliant's raid has become public, Gallagher is unfortunately expending considerable time, effort, and resources in order to combat Defendants' unlawful conduct, at a considerable cost and distraction to the business.

100.    The Targeted Employees each had access to valuable confidential information concerning Gallagher's clients and business strategies.  They were obligated, pursuant to the terms of their Agreements and fiduciary duties, to use that confidential information for the sole purpose of benefiting Gallagher and its affiliates.

101.    Since Alliant began its raids on Gallagher, Gallagher has lost the institutional knowledge of dozens of long-term employees experienced in servicing Gallagher clients across a variety of industries including, the health and welfare benefits consulting industry, and the commercial, casualty, real estate, and construction insurance industries.  Moreover, as noted above, Gallagher has lost client data and information, which was destroyed by the Targeted Employees on the way out the door to Alliant.

102.    Thus far, Alliant has illegally acquired over 80 of Gallagher's clients. Because the scheme is ongoing, Alliant will almost certainly steal more of Gallagher's clients if injunctive relief is not granted.  Determining causation on a client-by-client basis is a massive inquiry that will require an assessment of each of Gallagher's clients that has since left, efforts to retain the client and mitigate

damages, and a reasonable damages model that could provide a reliable valuation

conclusion.  Accordingly, as Vice Chancellor Laster acknowledged in the Lockton

Opinion, this type of harm is considered irreparable because of the "myriad issues

that this court would have to confront in a damages analysis." *Lockton*, 2019 WL

2536104, at *21.

103.   If allowed to continue unabated, Alliant's raid of Gallagher's

employees, clients, and proprietary business information will continue to cause

Gallagher significant harm.

104.   With this action, Gallagher is simply trying to stop Defendants from

illegally competing by further misappropriating Gallagher's confidential

information and capitalizing on the valuable relationships Gallagher developed

with its employees and clients over the years in direct contravention of the

Agreements.  Gallagher also seeks to recover damages it has suffered as a result of

the unlawful conduct of Defendants.

## FIRST CAUSE OF ACTION

### (Tortious Interference with Contract –
### Against Defendants)

105.   Gallagher incorporates by reference all allegations contained in the

preceding Paragraphs as though set forth fully herein.

106.   The Agreements entered into between Gallagher and the Targeted

Employees are valid contracts that contain unambiguous and reasonable

restrictions that, among other things, prohibit the Targeted Employees from doing the following for two years after they depart: (i) directly or indirectly soliciting, servicing, or consulting Gallagher client accounts; (ii) directly or indirectly soliciting, inducing, or recruiting Gallagher employees; and (iii) disclosing or misappropriating Gallagher's confidential information, including with respect to clients and business strategies.

107.   The Agreements also obligated the Targeted Employees to adhere to their fiduciary duties to Gallagher, including but not limited to a duty of loyalty, at all times while they were employed by Gallagher.  Additionally, the Agreements contained notice provisions requiring the Targeted Employees to provide written notice to Gallagher upon deciding to resign, and, in most instances, required that advanced notice be given by a specified number of days.

108.   Defendants were aware of the Agreements, along with their material terms, because the agreements are standard and common in the insurance brokerage industry, Alliant utilizes the same or similar agreements, and because Alliant is regularly sued for violating such agreements, including by Gallagher. Additionally, Gallagher notified Alliant of the terms and restrictions in the Agreements prior to filing suit in Florida.  The Targeted Employees were also required to provide their Agreements to Alliant.  For at least the past three years,

Stone Point has had the same three Directors on Alliant's Board of Directors, including throughout the Lockton litigation.

109.   Defendants' interference with these contracts was intentional.  Alliant frequently raids its competitors using a Playbook, which involves inducing producers and their teams to defect to Alliant and violate their agreements with their current employer.  Alliant does so intentionally, and with the backing of Stone Point, so that it can effectively acquire books of businesses without having to pay fair value for them.  Additionally, Defendants do not want producers to abide by the restrictive covenants in their agreements, which would leave the value Defendants seek—clients and team members—at their former employer.

110.   Consistent with the Playbook, Defendants actively solicited, induced, encouraged, and aided the Targeted Employees to breach each of the above-referenced contractual obligations to Gallagher in numerous ways.  These included encouraging the Targeted Employees to leave Gallagher without contractually required notice, breach duties of loyalty to Gallagher, solicit Gallagher's employees and clients to Alliant immediately after, and sometimes before, their resignation, blatantly stealing client lists and other confidential information and, in some cases, rebranding Gallagher's client-specific manual as Alliant's own.

111.   Stone Point made significant equity investments in Alliant in 2015 and 2019, which was integral to the growth strategy of Alliant, which included

actively soliciting, inducing, encouraging, and aiding the Targeted Employees to breach each of the above-referenced contractual obligations to Gallagher in numerous ways. Stone Point provides the capital that Alliant depends on to offer out-sized compensation packages to induce the Targeted Employees to breach their contractual duties, including valid restrictive covenants, all for the benefit of Stone Point and Alliant's bottom line. Gallagher also understands that Stone Point and Alliant coordinate closely to ensure that Alliant has the cash and stock needed to execute its targeted slate of leveraged hires. Additionally, Stone Point holds three of the eight seats on Alliant's Board of Directors and "provide[s] management services to Alliant," including with respect to the specific unlawful growth strategy at issue here.

112.   Alliant's raid of Gallagher intensified after it was rebuffed in its offer to purchase Florida producer Ghirardini's book of business. After Gallagher rejected Alliant's proposal, Alliant said Gallagher's response was "noted and will be remembered."

113.   Alliant, with the financial backing of Stone Point, offered the producer Targeted Employees deals that were contingent on their immediately moving clients from Gallagher to Alliant. Alliant structured the deals so that a Targeted Employee's compensation would increase as clients moved to Alliant. When one Gallagher employee asked about Gallagher's Non-Solicitation Clauses,

having filed the Delaware Certificate of Conversion and reincorporated in California, Alliant told him that it did "not have the same perspective" on the Agreement and underscored that Defendants have been "extremely successful" in effectuating the Playbook.

114.   Alliant, with the knowledge and backing of Stone Point, orchestrated mass resignations over a short period of time to maximize the disruption to business.  For example, at least one producer held off on resigning until a Monday so that Gallagher would not have the weekend to prepare a litigation strategy before he could start bringing in business for Alliant.

115.   Alliant attempted to hide what they knew to be bad conduct, including by using third-party recruiters to notify Targeted Employees about specific job openings and telling the Targeted Employees to patiently wait for an offer from Alliant—in direct violation of their Non-Solicitation Clauses.   The Targeted Employees were also instructed to sign PEDPs designed to cover up Alliant's true intent.  Alliant also attempted to evade the consequences of its bad actions by filing a Certificate of Conversion in Delaware and reincorporating in California.   This would have required approval by Alliant's Board of Directors, including the three principals at Stone Point.

116.  But for Defendants' interference, Gallagher had a reasonable expectation of maintaining its existing business and relationships during the terms

set out in the relevant Agreements regarding Non-Solicitation Clauses with respect to both its employees and client accounts.

117.   Defendants' intentional conduct was without privilege or justification, and was accomplished through improper means and with an improper purpose.

118.   Defendants' interference with the contractual relations between Gallagher and the Targeted Employees caused Gallagher to suffer harm, including loss of market share, current and future client relationships, loss of reputation and goodwill, and lost revenues.

119.   In addition to interfering with the contracts Gallagher entered into with its employees, Defendants also tortiously interfered with Gallagher's contracts with its clients.

120.   For example, since February 1, 2007, Gallagher has had a "Compensation Agreement" with PestSure that obligated PestSure to pay Gallagher fees for certain brokerage and administrative services Gallagher provided.  During the duration of the Compensation Agreement, PestSure paid these fees to Gallagher.

121.   Additionally, since February 2007, Gallagher has had a general agency agreement with an insurance carrier, which obligated the insurance carrier to pay Gallagher commissions in exchange for marketing the insurance carrier's

insurance to the members of PestSure.  During the duration of the general agency agreement, the insurance carrier paid these commissions to Gallagher.

122.   Alliant knew or should have known of the existence of these agreements, as it is standard in the industry to enter into such compensation agreements with clients and insurance companies.

123.   Alliant's wrongful, knowing, intentional and malicious actions, which included poaching Burke and his team from Gallagher and working to clandestinely solicit PestSure's business, in part through misappropriating and using confidential information about Gallagher's relationship with PestSure, caused PestSure and the insurance carrier to terminate their agreements with Gallagher.

124.   Defendants' intentional conduct was without privilege or justification, and was accomplished through improper means and with an improper purpose.

125.   Defendants' interference with the contractual relations between Gallagher, its clients, and insurance carriers caused, and is continuing to cause, Gallagher to suffer harm, including loss of these client and related insurer relationships, the fees and commissions they generated, and additional loss of reputation and goodwill.

126.   Gallagher lacks an adequate remedy at law.

## SECOND CAUSE OF ACTION

**(Tortious Interference with Prospective Economic Advantage / Prospective Business Relationships – Against Alliant)**

127.   Gallagher incorporates by reference all allegations contained in the preceding Paragraphs as though set forth fully herein.

128.   During all relevant times, Gallagher was engaged in numerous discussions with current clients about potential future business opportunities. Gallagher was also in active discussions with potential clients to solicit their business.   Given Gallagher's time and effort with respect to this business development, as well as its reputation in the industry, Gallagher was reasonably likely to secure these business opportunities.

129.   Alliant intentionally interfered with Gallagher's prospective business relationships by targeting and recruiting the Targeted Employees, whom Alliant understood to be assisting with the development of these business relationships, and by aiding the Targeted Employees in soliciting Gallagher's clients and potential future clients.

130.   Alliant's intentional interference was the proximate cause of Gallagher losing business it spent significant time, energy, and resources to develop.   But for Alliant's interference, Gallagher had a reasonable expectation of maintaining its existing business and relationships during the terms set out in the

relevant Agreements regarding Non-Solicitation Clauses with respect to both its employees and client accounts.

131.   As a result of Alliant's actions, Gallagher was harmed and has incurred, and will continue to incur, irreparable harm and damage.

132.   Gallagher lacks an adequate remedy at law.

## THIRD CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty – Against Defendants)

133.   Gallagher incorporates by reference all allegations contained in the preceding Paragraphs as though set forth fully herein.

134.   The Targeted Employees owed fiduciary duties, including, but not limited to, a duty of loyalty, to Gallagher at all times they were employed by Gallagher up to and until they departed, including with respect to Gallagher's confidential information.

135.   Defendants aided and abetted the Targeted Employees in breaching their fiduciary duties in the following manner:

(a)    Disclosing to Alliant, or otherwise misusing for the benefit of Alliant, Gallagher's confidential information with respect to current and former employees, clients, and business strategies;

(b)    Soliciting, or attempting to solicit, directly or indirectly, Gallagher's employees for the benefit of Alliant; and

(c)    Soliciting, or attempting to solicit, directly or indirect, Gallagher's clients for the benefit of Alliant.

136.   Defendants knew that the Targeted Employees owed fiduciary duties to Gallagher, but nevertheless aided and abetted their breaches.  Indeed, prior to their departures, the Targeted Employees became de facto double agents for Alliant at Alliant's request and encouragement.  During the period before they left, the Targeted Employees actively began recruiting others to come with them to Alliant, even asking them about their compensation so they could determine what Alliant would need to offer.  The Targeted Employees actively communicated with clients in the days leading up to their departures about leaving Gallagher for Alliant and misappropriated confidential Gallagher information for Alliant.

137.   To incentivize this behavior, Alliant, with the financial backing of Stone Point, offered Targeted Employees deals that were contingent on their immediately moving current and future business from Gallagher to Alliant.  Alliant structured the deals so that a Targeted Employee's compensation could increase as clients moved to Alliant.  When one employee asked about Gallagher's Non-Solicitation Clauses, Alliant told him that it did "not have the same perspective" on the Agreement and underscored that it has been "extremely successful" in effectuating its raid strategy.

138.   Stone Point made significant equity investments in Alliant in 2015 and 2019, which was integral to the growth strategy of Alliant, which included actively soliciting, inducing, encouraging, and aiding the Targeted Employees to breach each of the above-referenced contractual obligations to Gallagher in numerous ways.  Stone Point provides the capital that Alliant depends on to offer out-sized compensation packages to induce the Targeted Employees to breach their contractual duties, including valid restrictive covenants, all for the benefit of Stone Point and Alliant's bottom line.  Gallagher also understands that Stone Point and Alliant coordinate closely to ensure that Alliant has the cash and stock needed to execute its targeted slate of leveraged hires.  Additionally, Stone Point holds three of the eight seats on Alliant's Board of Directors and "provide[s] management services to Alliant," including with respect to the specific unlawful growth strategy at issue here.

139.   As a direct and proximate result of this conduct, which was in material breach of the Targeted Employees' fiduciary duties owed to Gallagher, Gallagher has suffered and will continue to suffer, unless enjoined, damage and irreparable harm.

140.   These actions, in material breach of the Targeted Employees' fiduciary duties to Gallagher, resulted in substantial damage and irreparable harm to Gallagher and were taken maliciously and were the result of willful misconduct.

141.   Defendants knowingly participated in, and benefitted from, the breaches of fiduciary duties described above by, among other things, encouraging the Targeted Employees to solicit Gallagher's employees, clients, and confidential information related to clients and business strategies, all the benefit of Alliant.

142.   Gallagher lacks an adequate remedy at law.

### FOURTH CAUSE OF ACTION

**(Civil Conspiracy – Against Defendants)**

143.   Gallagher incorporates by reference all allegations contained in the preceding Paragraphs as though set forth fully herein.

144.   Stone Point controls Alliant through its ownership of a vast majority of Alliant shares.

145.   Three Stone Point principals occupy three of the eight seats on Alliant's Board of Directors.

146.   For an annual fee, Stone Point provides management services to Alliant, "assists [Alliant's] management with all material add-on acquisitions," and has helped it "evaluate business line expansion opportunities and alternative distribution strategies."

147.   After it purchased a majority stake in Alliant in 2015, Stone Point began to work with Alliant and encouraged it to engage in a growth strategy that

involved raiding the employees and clients of its competitors.  As a result of this strategy, for example, Alliant has been sued 13 times since 2018.

148.   Faced with this rising tide of lawsuits exposing the wrongfulness of Alliant's strategy for acquisitions, Stone Point has continued to direct and assist Alliant's wrongful acts.

149.   Stone Point has continued to provide funding to Alliant and has assisted Alliant in obtaining funds from other sources, to facilitate Alliant's growth through these illicit raids, including the raid on Gallagher.  Gallagher understands that Stone Point and Alliant coordinate closely to ensure that Alliant has the cash and stock needed to execute its targeted slate of leveraged hires.

150.   Additionally, faced with the Lockton decision, and in light of Alliant's ongoing raid of Gallagher, Stone Point worked with Alliant and certainly approved of Alliant filing a Certificate of Conversion with the Delaware Secretary of State. As described in the preceding paragraphs, filing this Certificate of Conversion was a substantial step in facilitating Alliant's tortious acts against Gallagher.

151.   With Stone Point's management and assistance, Alliant solicited, induced, and encouraged the Targeted Employees to breach their contractual obligations to Gallagher in numerous ways, including through breaching their Non-Solicitation Clauses, notice, fiduciary, and confidentiality agreements with Gallagher.   These actions have and continue to cause Gallagher significant harm

in the form of lost clients and prospective business opportunities, as well as reputational harm.

152.   With Stone Point's management and assistance, Alliant also tortiously interfered with Gallagher's contracts with its clients, causing Gallagher significant harm.

153.   As a result of the actions orchestrated by Defendants, Gallagher was harmed and has incurred, and will continue to incur, irreparable harm and damage.

154.   Gallagher lacks an adequate remedy at law.

## **PRAYER**

Wherefore, Gallagher prays for an order of this Court:

(a)   Declaring that Alliant has interfered with Gallagher's prospective business relationships;

(b)   Declaring that Defendants have (i) interfered with Gallagher's contractual relations; and (ii) aided and abetted breaches of fiduciary duties owed to Gallagher;

(c)   Declaring that Defendants have engaged in a conspiracy to: (i) interfere with Gallagher's contractual relations; (ii) interfere with Gallagher's prospective business relationships; and (iii) aid and abet breaches of fiduciary duties owed to Gallagher;

(d)     Ordering that Defendants provide an accounting to Gallagher of any and all confidential and proprietary information that has been collected, used or disclosed to any person or entity;

(e)     Ordering that Defendants pay to Gallagher all damages sustained by Gallagher arising from the foregoing misconduct;

(f)     Ordering that Defendants account to Gallagher for all gains, profits, and other advantages unjustly obtained by Defendants as a result of their wrongful acts;

(g)     Order expedited discovery on this matter;

(h)     Issue a preliminary and permanent injunction that enjoins Defendants as follows:

- Enjoining Alliant from directly or indirectly accepting, servicing, or working on any of Gallagher's clients that the Targeted Employees produced or serviced while employed at Gallagher, including, but not limited to, those clients that have already transitioned from Gallagher to Alliant;

- Enjoining Alliant from maintaining, possessing, using, disclosing, or providing to any third party Gallagher's confidential information;

- Enjoining Alliant from using Gallagher's confidential information to solicit clients or render services to clients;

- Enjoining Alliant from using Gallagher's confidential information to solicit Gallagher's employees;

- Enjoining Defendants from inducing (directly or indirectly) the Targeted Employees or any Gallagher employees to violate the terms of their Agreements, including, but not limited to, the Non-Solicitation Clauses and related obligations and confidentiality agreements with Gallagher;

- Enjoining Defendants from aiding and assisting the Targeted Employees, or any other Gallagher employees, in violating their duties to, and Non-Solicitation Clauses and related obligations and confidentiality agreements with, Gallagher;

- Enjoining Defendants from conspiring to: (i) interfere with Gallagher's contractual relations; (ii) interfere with Gallagher's prospective business relationships; and (iii) aid and abet breaches of fiduciary duties owed to Gallagher;

- Ordering Alliant to account for all Gallagher's confidential information that Alliant misappropriated;

- Ordering Alliant to return to Gallagher all of its confidential information in Alliant's possession, custody, and control; and

- Ordering Alliant to, after returning Gallagher's confidential information, certify in writing and under the pains of penalties or perjury that all paper and electronic copies of all Gallagher's confidential information in Alliance's possession, custody, or control have been returned and, if electronic, upon resolution of these proceedings, have been permanently deleted from any location where they have been stored.

(i)   Award all of the costs and attorneys' fees Gallagher has incurred in connection with this action; and

(j)   Award such other and further relief as this Court deems just and is proper.

Dated:  September 14, 2020

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


/s/ Ryan D. Stottmann

OF COUNSEL:                         Kenneth J. Nachbar (#2067)
                                    Ryan D. Stottmann (#5237)
Andrew M. Berdon                    Thomas P. Will (#6086)
QUINN EMANUEL URQUHART &            Miranda Gilbert (#6662)
SULLIVAN, LLP                       1201 North Market Street
51 Madison Avenue, 22nd Floor       Wilmington, DE  19801
New York, NY 10010                  (302) 658-9200
(212) 849-7000
                                        *Attorneys for Plaintiffs*
Lazar P. Raynal
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 North Wacker, Ste. 2700
Chicago, IL 60610
(312) 705-7400

# EXHIBIT B

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARTHUR J. GALLAGHER & CO., | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil No. _____ |
| ALLIANT INSURANCE SERVICES, | ) | |
| INC., AND STONE POINT CAPITAL, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S MOTION TO EXPEDITE

Plaintiff Arthur J. Gallagher & Co. ("Gallagher") hereby moves for expedited proceedings in support of Gallagher's forthcoming motion for a preliminary injunction against Defendants Alliant Insurance Services, Inc. ("Alliant") and Stone Point Capital, LLC ("Stone Point" and with Alliant, collectively, the "Defendants").

## INTRODUCTION

1.      Alliant, with the assistance of its private equity owner Stone Point, is in the midst of an ongoing, nationwide, illicit raid of Gallagher's producers and employees (the "Targeted Employees") and its clients.  Using a calculated and unlawful playbook, Alliant so far has poached 39 Targeted Employees and scores of Gallagher clients.

2.      Despite Gallagher's effort to stop Alliant's conduct through litigation in other jurisdictions, Alliant has attempted to evade accountability and

1

continues its raid at full speed—targeting Gallagher employees and clients nationwide.  Gallagher now seeks this Court's assistance to stop Alliant's unlawful activity, much as the complaining Plaintiffs did approximately fifteen months ago in a case captioned *Mt. West Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, No. 2019-0226-JTL (Del. Ch. 2019) ("Lockton"), another raid case in which Alliant deployed its unlawful playbook.

3.      In Lockton, following expedited discovery, this Court issued a preliminary injunction against Alliant.  As with Gallagher, Alliant induced Lockton's employees to breach their contracts, initiated a "full-court press" to solicit Lockton's clients, and engaged in "secretive and underhanded behavior in violation of contractual obligations and legal requirements"—while "mask[ing] their activities under a façade of compliance measures and through misleading representations and averments."  *Lockton*, 2019 WL 2536104, at *2, 47.

4.      Here, Alliant began clandestinely laying the foundation for its raid in 2019 by: (i) working with Stone Point to raise equity; and (ii) recruiting top Gallagher producers and senior employees to move their books of business to Alliant for outsized cash and stock-rich compensation.  With these plans in motion, in March 2020, Alliant approached Gallagher with a threat couched as an offer:  sell Alliant the books of business Alliant wants, or else.  When Gallagher refused, Defendants pressed forward with their nationwide raid—inducing the Targeted Employees to

resign without notice and immediately begin soliciting their clients to make Alliant their new "broker of record" in direct breach of contractual and other duties owed to Gallagher.  Even prior to their purported dates of resignation,  many of the Targeted Employees began working as double agents on Alliant's behalf, misappropriating Gallagher's confidential client information and soliciting Gallagher's clients to Alliant.

5.     This activity continued throughout August and early September; is ongoing; and will continue unless enjoined.  For example, on or about August 25, Gallagher learned that Alliant had misappropriated a Gallagher client procedures manual and rebranded it as its own.  On August 24, 25 and September 3, Alliant and its agents communicated with the head of a Gallagher business unit in its Atlanta office, offering him a position expressly conditioned on his ability to shift an existing "block" of Gallagher business to Alliant, irrespective of the non-solicitation clauses in his employment agreement.  Alliant's representatives explained that its "leveraged hire" playbook was well-developed, and was made possible by the close alignment between senior Alliant management and its private equity owners at Stone Point who provided capital needed to fund contracts with multi-year guarantees and equity grants that would permit the employee to reap millions in longer-term compensation upon execution of an "exit" transaction by Stone Point.  The Alliant representatives also stressed that the key to its offer is the portability of the target's existing client

relationships.   There  was  no  discussion  whatsoever  about  strategies  for  the acquisition  of  new  clients  who  were  not  currently  Gallagher  clients.   And,  on September 14, a known Alliant recruiter contacted Gallagher's area vice president for its Lubbock, Texas office, seeking to poach him.

6.     In light of the ongoing attack on its business and client relationships, Gallagher  requests  expedited  proceedings  to  support  its  request  for  a  preliminary injunction halting this unlawful conduct.  As explained below, Gallagher has strong claims that Alliant is tortiously interfering with Gallagher's contractual and business relationships  with  employees  and  clients,  aiding  and  abetting  the  Targeted Employees'  breaches  of  their  fiduciary  duties,  and  conspiring  with  Stone  Point, causing Gallagher irreparable injuries.

7.     Gallagher's Motion to Expedite should be granted.

## **BACKGROUND**[1]

8.     Gallagher  is  one  of  the  largest  insurance  brokers  in  the  world. Compl. ¶ 26.  Alliant is an insurance brokerage firm and a direct competitor of Gallagher.  *Id.* at ¶ 2.

9.     In 2015, Alliant was acquired by Stone Point, a private equity firm and Delaware corporation, headquartered in Greenwich, Connecticut.  *Id.* at ¶¶ 31-

---

[1] A full recitation of the facts is set forth in Gallagher's Verified Complaint, which is incorporated herein by reference.

38. Since Stone Point purchased Alliant and took control of three of its eight Board of Director seats, Defendants have implemented in earnest a playbook involving illicit "leveraged hires," of Alliant's competitors' employees and clients. *Id.* at ¶¶ 36, 39.

10. In 2019, to fuel future raids, including a raid against Gallagher, Alliant raised capital through investments from Stone Point and, with Stone Point's assistance, others. *Id.* at ¶ 68. Supported by these funds, Defendants planned to raid many of Gallagher's top employees and steal its clients. *Id.* at ¶¶ 68-72; 93(a)-(c).

11. On January 29, 2020, just three weeks after this Court entered a permanent injunction in Lockton, Alliant filed a Certificate of Conversion to change its state of incorporation from Delaware to California. This was a clear move by Alliant to avoid future judicial scrutiny in Delaware, whose courts have already found Alliant's actions to be unlawful. *Id.* at ¶¶ 9, 23, 27, 31, 70-71. Alliant would later use the Certificate of Conversion as part of its effort to induce the Targeted Employees to violate their Agreements. *Id.* at ¶¶ 31, 71.

12. Alliant began soliciting employees of Gallagher's offices in Florida, culminating in the March 2020 resignation of three of Gallagher's top Florida-based employees, including David Ghirardini, Gallagher's Area Senior Vice President in Benefits, and the team that worked with them. *Id.* at ¶¶ 74, 92; 93(d).

13.     After executing these first three resignations—giving Gallagher a taste of what might follow—Alliant made a threat couched as an "offer"—sell us your client relationships, or else.  *Id.* at ¶¶ 75, 93(e)-(g).  When Gallagher refused, Alliant executed its broader plan, soliciting the clients Ghirardini had serviced with the Florida-based Targeted Employees' assistance.  *Id.* at ¶¶ 76, 93(h)-(i).

14.     On April 24, 2020, Gallagher sued Alliant and certain former employees in response to the Florida raid, seeking injunctive relief.  *Id.* at ¶ 77. Alliant maneuvered to delay this litigation—seeking to disqualify the judge and appealing that denial—all while expanding its raid against Gallagher.  *Id.* at ¶ 77 n.7. Alliant continues to solicit and steal Gallagher's Florida benefits accounts, with one client terminating as recently as August 25 and others suggesting they may soon leave Gallagher.  *Id.* at ¶¶ 93(i).

15.     Alliant next focused on Gallagher's San Francisco operations where they targeted producers who had previously sold their businesses to Gallagher.  *Id.* at ¶¶ 69, 72, 78-79.  In July, Alliant orchestrated the mass resignation of fifteen employees who worked for these producers, without notice.  Each of those employees immediately joined Alliant and worked with the producers to solicit their Gallagher clients to move their business.  *Id.* at ¶¶ 78-79, 92.

16.     The producers and employees continue to solicit employees and clients for Alliant—often using confidential Gallagher information.  *See id.* at ¶¶ 79,

93(c), (k)-(r), (u)-(x), (dd), (qq).  For example, on August 21, another San Francisco-based Targeted Employee left to join Alliant.  *Id.* at ¶ 92.  Approximately 50 California clients have left Gallagher for Alliant thus far—one was unlawfully solicited as recently as August 25.  *Id.* at ¶¶ 79.

17.     In mid-August, Alliant raided Gallagher's Dallas, Texas operations. *Id.* at ¶ 81.  Alliant focused on three of Gallagher's key producers, each of whom had large books of business.  *Id.*  Alliant contacted all three while they were still at Gallagher and turned them and their teams into double agents, misappropriating Gallagher information to steer employees and client accounts to Alliant.  *See, e.g., id.* at ¶ 81, 93(s), (cc), (jj)-(kk), (nn)-(pp).  It was soon discovered that the  Dallas-based Targeted Employees had stolen a proprietary Gallagher client-procedures manual, made cursory edits to the manual to conform with Alliant's systems, erased (most of) the references to Gallagher, and falsely rebranded the manual as an Alliant document.  *Id.* at ¶ 93 (mm).

18.     These key Dallas producers continue to solicit and steal Gallagher's employees and clients.  So far, 19 Dallas-based Targeted Employees have left Gallagher for Alliant, and two were poached within the last three weeks.  *Id.* at ¶ 92, 93(rr).  These employees have interfered with many of Gallagher's client relationships, for example, inducing a longstanding client and an insurer to

terminated their contracts with Gallagher and move their business to Alliant.  *Id.* at ¶ 93(ee)-(ii).

19.     Alliant shows no indication that it plans to stop its raids.  *See, e.g., id.* at ¶¶ 93(j), (y)-(bb).  On August 24, Alliant attempted to poach the head of the benefits practice in Gallagher's Atlanta, Georgia region.  *Id.* at ¶¶ 85-89, 93(ss)-(uu). Alliant and its agent explained that its offer was contingent on the manager's ability to bring Gallagher clients to Alliant, suggested that the manager should disregard the non-solicitation provisions in his employment agreement, and explained that Stone Point and Alliant coordinate closely to ensure that Alliant has the cash and stock needed to execute its planned leveraged hires.  *Id.*  On September 14, the same recruiter that initially contacted the Atlanta manager reached out to Gallagher's area vice president in Lubbock, Texas, seeking to poach him.  *Id.* at ¶ 93(vv).

20.     If allowed to continue, these attacks will continue to irreparably harm Gallagher's business through stripping it of valuable employees and clients. *Id.* at ¶¶ 94-104.

## **ARGUMENT**

21.     Gallagher is entitled to expedited proceedings upon showing: (1) a "sufficiently colorable claim"; and (2) "a sufficient possibility of threatened irreparable injury."  *In re Ness Techs., Inc.*, 2011 WL 3444573, at *2 (Del. Ch. Aug. 3, 2011).  "In assessing a motion to expedite, [a court is] guided by the well-pled,

verified allegations of the Complaint." *Shocking Techs., Inc. v. Michael*, 2012 WL 165561, at *1 (Del. Ch. Jan. 10, 2012). "The burden on a plaintiff in seeking an expedited proceeding is not high" and a party's request for expedited proceedings is "normally routinely granted." *Renco Grp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2013 WL 209124, at *1 (Del. Ch. Jan. 18, 2013).

### A.    Gallagher's Claims are Colorable

22.    The Verified Complaint's claims more than meet the "sufficiently colorable" standard. Specifically, Gallagher alleges that Alliant: (i) tortiously interfered with Gallagher's contracts and prospective business relationships; (ii) aided and abetted the Targeted Employees' breaches of fiduciary duties; and (iii) conspired with Stone Point.

23.    Gallagher has a colorable claim against the Defendants for tortious interference with contracts. The Verified Complaint contains a multitude of allegations setting forth: "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at *25 (Del. Ch. Nov. 17, 2014). Similarly, Gallagher has set forth a strong claim against Alliant for tortious interference with prospective business relations, which requires, "(1) a reasonable probability of a business opportunity; (2) intentional interference by a defendant with that

opportunity; (3) proximate causation; and (4) damages." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 607-08 (Del. Ch. 2010).

24.    Each of the Targeted Employees had a valid and enforceable employment agreement including non-solicitation and confidentiality provisions. Compl. at ¶¶ 56-59, 106.[2]  Alliant and Stone Point, were aware of these contracts, which contain industry standard provisions similar to those Alliant uses in its own agreements. *Id.* at ¶¶ 63-65, 108.  The Defendants' intentionally interfered with them. *Id.* at ¶109.

25.    The Defendants' coordinated raid convinced 39 employees to resign with little to no notice and immediately solicit Gallagher's clients and other employees in breach of their contractual obligations. *Id.* at ¶¶ 21, 90-92, 110; *see also NAMA Holdings,* 2014 WL 6436647, at *26; *ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749, 751 (Del. 2010).  Additionally, Alliant, with the knowledge and backing of Stone Point, caused the Targeted Employees to steal clients, prospective business opportunities, client lists and other confidential information, and, in some

---

[2]  The provisions are valid regardless of which state's laws apply. *See, e.g., Picture It Sold Photography, LLC v. Bunkelman,* 287 So. 3d 699 (Fla. Dist. Ct. App. 2020) (enforcing covenants restricting competition and solicitation); *Alliant Ins. Servs., Inc. v. Gaddy*, 159 Cal. App. 4th 1292, 1307 (2008) (enforcing non-solicitation provision and upholding preliminary injunction obtained by Alliant); *Smith v. Nerium Int'l, LLC,* No. 05-18-00617-CV, 2019 WL 3543583, at *6 (Tex. App. Aug. 5, 2019) (upholding temporary injunction based on two year non-solicitation clause).

cases, rebrand materials stolen from Gallagher as Alliant's own.  Compl. at ¶¶ 94, 110-113.  Alliant's intent is exposed by its efforts to hide its conduct.  *Id.* at ¶ 115.

26.     Alliant's scheme has already caused Gallagher to lose scores of client accounts and it expects to lose more without injunctive relief.  *Id.* at ¶¶ 21-22, 118, 139-140.  *See Beard Research,* 8 A.3d at 609-10.  The ongoing raids continue to cause Gallagher injury as it loses additional employees and clients, and suffers reputational harm.  Compl. at ¶¶ 22, 139.

27.     Alliant has also tortiously interfered with Gallagher's contracts with clients and insurers.  *Id.* at ¶¶ 93(ee)-(ii), 119-123.  Through its bad acts, Alliant knowingly caused clients and insurers to terminate their contracts with Gallagher. *Id.* at ¶¶ 93(ee)-(ii), 122-123.

28.     Gallagher also has a colorable claim against the Defendants for aiding and abetting the Targeted Employees' breaches of fiduciary duties.  That claim requires: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in that breach by the defendants who are not fiduciaries."  *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986).  The Targeted Employees owed fiduciary duties to Gallagher, including duties of candor and loyalty.  Compl. at ¶¶ 60-62, 134.

29.     Alliant, with Stone Point's knowledge and support, knowingly coordinated with the Targeted Employees, while they still worked at Gallagher, to

breach their fiduciary duties to Gallagher in multiple ways, including by misappropriating confidential and proprietary business information and soliciting Gallagher's employees and clients for Alliant. *Id.* at ¶¶ 135-138; *see, e.g. E.I. du Pont de Nemours & Co. v. Am. Potash & Chem. Corp.*, 200 A.2d 428, 432 (Del. Ch. 1964) (disclosing confidential information may be a breach of fiduciary duty); *Beard Research, Inc.*, 8 A.3d at 602 (an employee breaches their fiduciary duty when they 'solicit[ an] employer's customers before cessation of employment'").

30.     The elements of a conspiracy are: (1) a confederation of two or more persons; (2) an unlawful act in furtherance of the conspiracy; and (3) actual damage. *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 150 (Del. 1987).

31.     Stone Point conspired with Alliant to commit its tortious behavior. Compl. at ¶¶ 144-152.  Stone Point provided funding and management to Alliant to support Alliant's growth.  *Id.* at ¶¶ 146-149.  Stone Point also sits on Alliant's Board and directed and assisted Alliant's acts.  For example, Alliant's "leveraged hire" playbook was made possible by the close alignment between Alliant and Stone Point, which provided the needed capital for Alliant's raids.  *Id.* at ¶¶ 36, 111.

32.     Because of the above bad acts, Gallagher lost numerous veteran employees, clients, prospective business opportunities, and suffered reputational damage.  *Id.* at ¶¶ 151-153.

33.    Accordingly, Gallagher has colorable claims sufficient to support expedition.

**B.    Gallagher Has Demonstrated Threatened Irreparable Harm**

34.    Gallagher will continue to suffer irreparable harm, if Alliant is allowed to continue stealing Gallagher's confidential information, employees, and current and prospective clients.  *Id.* at ¶¶ 94-104.  Alliant's conduct in this case mirrors its raid in Lockton and irreparable injury exists because of the "myriad issues that this court would have to confront in a damages analysis." *Lockton*, 2019 WL 2536104, at \*20; *see also In re Shawe & Elting LLC*, 2015 WL 4874733, at \*28 (Del. Ch. Aug. 13, 2015) (quotations omitted) ("[I]rreparable harm…[can] include harm to a corporation's reputation, goodwill, customer relationships, and employee morale.").

35.    In addition, each of Gallagher's Agreements, including those signed by the Targeted Employees, acknowledges that a breach of the non-solicitation, notice, and obligation not to misappropriate confidential information terms would cause irreparable harm.  Compl. at ¶¶ 97-98.  Such agreements are enforceable.  *See Lockton*, 2019 WL 2536104, at \*21 (finding irreparable harm, in part, because the agreements at issue stipulated that a breach would "give rise to irreparable harm").

36.    In any event, Delaware law "has consistently found a threat of irreparable [harm] in circumstances whe[re] a covenant not to compete is breached."

13

*Hough Assocs.*, 2007 WL 148751, at *18; *see also, e.g.*, *Dickinson Med. Grp., P.A. v. Foote*, 1984 WL 8208, at *3 (Del. Ch. May 10, 1984).  Delaware courts have noted that "[d]amages would not adequately compensate Plaintiffs for a breach of the confidentiality provisions because the purpose of such provisions is to prevent harm and misuse before it occurs."  *Horizon Personal Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *20 (Del. Ch. Aug. 4, 2006); *Cabela's*, 2018 WL5309954, at *13-14 (Del. Ch. Oct. 26, 2018) (breaches of non-solicitation and confidentiality provisions would subject plaintiff to unfair competition and irreparable harm).  Such prospective irreparable harm is redressable by injunction. *See Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *10 (Del. Ch. Mar. 27, 2014).

## CONCLUSION

For the reasons set forth above and in the Verified Complaint filed herewith, Gallagher respectfully requests that its Motion to Expedite be granted and that the Court enter the proposed form of order submitted herewith.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Andrew M. Berdon
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Lazar P. Raynal
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 North Wacker, Ste. 2700
Chicago, IL 60610
(312) 705-7400

/s/ Ryan D. Stottmann
Kenneth J. Nachbar (#2067)
Ryan D. Stottmann (#5237)
Thomas P. Will (#6086)
Miranda Gilbert (#6662)
1201 North Market Street
Wilmington, DE  19801
(302) 658-9200

*Attorneys for Plaintiff*

Words: 2,970

September 14, 2020

15

# EXHIBIT C

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 2020-_____ |
| | ) |
| ALLIANT INSURANCE SERVICES, | ) |
| INC., AND STONE POINT CAPITAL, | ) |
| LLC, | ) |
| | ) |
| Defendants. | ) |

## [PROPOSED] ORDER EXPEDITING PROCEEDINGS

WHEREAS, Plaintiff Arthur J. Gallagher & Co., having filed a Motion

for Expedited Proceedings (the "Motion"), and for good cause shown,

IT IS HEREBY ORDERED, this ___ day of _____, 2020, that:

1.    The Motion is hereby GRANTED;

2.    A hearing on Plaintiff's Motion for Preliminary Injunction will

be held on _____, ____, 2020.

3.    The parties shall negotiate and submit an agreed upon schedule

for expedited discovery and briefing on Plaintiff's Motion for Preliminary Injunction

in advance of the hearing date scheduled above.


_____
[Vice] Chancellor

# EXHIBIT D

EFiled:  Sep 14 2020 06:54PM EDT
Transaction ID 65930601
Case No. 2020-0780-

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ARTHUR J. GALLAGHER & CO., )
                           )
            Plaintiff,     )
                           )
     v.                    )   C.A. No. 2020-
                           )
ALLIANT   INSURANCE   SERVICES,)
INC., AND STONE POINT CAPITAL,)
LLC,                       )
                           )
            Defendants.    )

## VERIFICATION PURSUANT TO 10 *DEL. C.* § 3927

I, Michael R. Pesch, do hereby depose and say that I am Michael

R. Pesch. I am duly authorized to execute this Verification on behalf of

Plaintiff Arthur J. Gallagher & Co., and do so pursuant to 10 *Del. C.* § 3927 in

accordance with Delaware Supreme Court Administrative Order No. 3 In re

COVID-19 Precautionary Measures, dated March 22, 2020. I have read the

foregoing Complaint, and the statements set forth therein are, to the best of my

knowledge, information, and belief, true and correct. I declare under penalty of

perjury under the laws of Delaware that the foregoing is true and correct.

Executed on the 14th day of September, 2020.

_MICHAEL R PESCH_____
Printed Name

_____
Signature

# EXHIBIT E

EFiled: Sep 14 2020 06:54PM EDT
Transaction ID 65930601
Case No. 2020-0780-

SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(A)
OF THE RULES OF THE COURT OF CHANCERY

The information contained herein is for the use by the Court for statistical and administrative purposes only.  Nothing stated herein shall be deemed an admission by or binding upon any party.

1.    Caption of Case:  *Arthur J. Gallagher & Co., v. Alliant Insurance Services, Inc., and Stone Point Capital, LLC*

2.    Date Filed: September 14, 2020

3.    Name and address of counsel for plaintiff(s):

Kenneth J. Nachbar (#2067), Ryan D. Stottmann (#5237), Thomas P. Will (#6086), Miranda N. Gilbert (#6662)
Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, DE  19801

4.    Short statement and nature of claim asserted:  Action for injunctive relief to prevent further tortious interference with contract, tortious interference with prospective economic advantage and prospective business relationships, aiding and abetting breach of fiduciary duty, and civil conspiracy.

5.    Substantive field of law involved (check one):

| | | |
|---|---|---|
| ___ Administrative law | ___ Labor law | ___ Trusts, Wills and Estates |
| _X_ Commercial law | ___ Real Property | ___ Consent trust petitions |
| ___ Constitutional law | ___ 348 Deed Restriction | ___ Partition |
| ___ Corporation law | ___ Zoning | ___ Rapid Arbitration (Rules 96, 97) |
| ___ Trade secrets/trade mark/or other intellectual property | | ___ Other: |

6.    Related cases, including any Register of Wills matters (this requires copies of all documents in this matter to be filed with the Register of Wills):
*Mt. West Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, C.A. No. 2019-0226-JTL

7.    Basis of court's jurisdiction (including the citation of any statute(s) conferring jurisdiction):  10 *Del. C.* § 3104; 6 *Del. C.* § 18-105; 10 *Del. C.* § 341

8.    If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought.
N/A

9.    If the complaint seeks a TRO, summary proceedings, a Preliminary Injunction, or Expedited Proceedings, check here.  _X_  (If #9 is checked, a Motion to Expedite <u>must</u> accompany the transaction.)

10.   If the complaint is one that in the opinion of counsel should not be assigned to a Master in the first instance, check here and attach a statement of good cause.  X

*/s/ Miranda N. Gilbert*
Miranda N. Gilbert (#6662)

## STATEMENT OF GOOD CAUSE

The undersigned counsel for Plaintiff Arthur J. Gallagher & Co. hereby states that there is good cause why this action should not be assigned to a Master in the first instance.   This action seeks injunctive relief to prevent Defendants from further tortiously interfering with contract, tortiously interfering with prospective economic advantage and prospective business relationships, aiding and abetting breach of fiduciary duty, and engaging in civil conspiracy. Petitioner respectfully submits that the complexity and scope of the issues presented in this action are most appropriately resolved by the Chancellor or a Vice Chancellor in the first instance.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Miranda N. Gilbert*
Kenneth J. Nachbar (#2067)
Ryan D. Stottmann (#5237)
Thomas P. Will (#6086)
Miranda N. Gilbert (#6662)
1201 North Market Street
Wilmington, DE  19801
(302) 658-9200
*Attorneys for Plaintiff*

September 14, 2020

# EXHIBIT F

EFiled: Sep 14 2020 06:54PM EDT
Transaction ID 65930601
Case No. 2020-0780-

# MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

————

(302) 658-9200
(302) 658-3989 FAX

RYAN D. STOTTMANN
(302) 351-9430
(302) 425-4676 FAX
rstottmann@mnat.com

September 14, 2020

**BY E-FILING**

The Honorable Andre G. Bouchard
Chancellor, Court of Chancery
500 N. King Street
Wilmington, DE 19801

      Re:    *Arthur J. Gallagher & Co., v. Alliant Insurance Services, Inc., et al.,* C.A. No. 2020-_____

Dear Chancellor Bouchard:

      We represent Plaintiff Arthur J. Gallagher & Co. who today commenced the above-referenced action and filed a Motion to Expedite. Copies of these filings are enclosed, and we are providing Defendants with notice and courtesy copies of these papers. We respectfully request that the Court assign this action at its earliest convenience so that Plaintiff's motion may be heard.

      If Your Honor has any questions, counsel are available at the Court's convenience.

The Honorable Andre G. Bouchard
September 14, 2020
Page 2

                                         Respectfully,

                                           */s/ Ryan D. Stottmann*

                                           Ryan D. Stottmann (#5237)

                                           Words: 72

RS

# EXHIBIT G

EFiled:  Sep 14 2020 06:54PM EDT
Transaction ID 65930601
Case No. 2020-0780-

# Morris, Nichols, Arsht & Tunnell LLP

1201 North Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347

————

(302) 658-9200
(302) 658-3989 FAX

**Miranda N. Gilbert**
(302) 351-9194
(302) 225-2574 FAX
mgilbert@mnat.com

September 14, 2020

## BY E-FILING

Register in Chancery
New Castle County Courthouse
500 North King Street
Wilmington, DE  19801

> Re:   *Arthur J. Gallagher & Co., v. Alliant Insurance Services, Inc., et al.,* C.A. No. 2020-

Dear Sir or Madam:

Pursuant to Court of Chancery Rule 4, an employee of Morris, Nichols, Arsht & Tunnell LLP will be serving true and correct copies of the Verified Complaint and related suit papers requiring service in this action upon defendant, Alliant Insurance Services, Inc.  Service will be effected pursuant to 10 *Del. C.* § 3104 and 8 *Del. C.* § 266 by delivering the Verified Complaint and related suit papers to Alliant Insurance Services, Inc.'s registered agents at the following addresses: Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808; and to Corporate Secretary, Alliant Insurance Services Inc., 701 B Street, 6th Floor, San Diego, CA 92101.

Register in Chancery
September 14, 2020
Page 2

   Pursuant to Court of Chancery Rule 4, an employee of Morris, Nichols, Arsht & Tunnell LLP will be serving true and correct copies of the Verified Complaint and related suit papers requiring service in this action upon defendant, Stone Point Capital, LLC.  Service will be effected pursuant to a 6 *Del. C.* § 18-105 by delivering the Verified Complaint and related suit papers to Stone Point Capital, LLC's registered agent at the following address: Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

   Forms of summonses will be prepared by Morris, Nichols, Arsht & Tunnell LLP and presented to the Register in Chancery for signature and seal.

       Respectfully,

       */s/ Miranda N. Gilbert*

       Miranda N. Gilbert (#6662)

       Words: 214

MG

# EXHIBIT H

**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

J. TRAVIS LASTER
VICE CHANCELLOR

Leonard L. Williams Justice Center
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

September 15, 2020

Kenneth J. Nachbar, Esquire
Ryan D. Stottmann, Esquire
Thomas P. Will, Esquire
Miranda Gilbert, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
Wilmington, DE 19801

    RE:   *Arthur J. Gallagher & Co. v. Alliant Insurance Services, Inc., et al.*
           C.A. No. 2020-0780-JTL

Dear Counsel:

A hearing has been scheduled for Friday, September 18, 2020, at 11:00 a.m., on the plaintiff's motion to expedite. Please arrange a teleconference and provide all parties including Chambers with the dial-in information.

For the benefit of defendants, the fact that the date to respond to the complaint has not passed will not control my decision to consider a schedule. Likewise, any delay by defendants in obtaining Delaware counsel will not affect my decision to proceed. My general practice is to permit non-Delaware counsel, including in-house counsel, to appear for the purpose of the initial hearing. There is, however, a significant pool of excellent Chancery practitioners who are available on short notice.

Counsel should ensure that this letter is distributed to all parties immediately.

Sincerely yours,

*/s/ J. Travis Laster*

J. Travis Laster
Vice Chancellor

JTL/krw

# EXHIBIT I

EFiled: Sep 16 2020 04:02PM EDT
Transaction ID 65938329
Case No. 2020-0780-J__

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARTHUR J. GALLAGHER & CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 2020-0780-___ |
| v. | ) | |
| | ) | **SUMMONS** |
| ALLIANT INSURANCE SERVICES, | ) | ***6 Del. C.* § 18-105** |
| INC., AND STONE POINT CAPITAL, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**STATE OF DELAWARE**

**TO THE SPECIAL PROCESS SERVER- BRANDYWINE PROCESS SERVERS**

**YOU ARE COMMANDED:**

To Summon the above-named defendant, **Stone Point Capital, LLC**, pursuant to 6 *Del. C.* § 18-105, so that, within 20 days after service hereof upon defendant, exclusive of the day of service, defendant shall serve upon Miranda N. Gilbert, Esquire, Plaintiff's attorney, whose address is Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, Wilmington, Delaware 19801, an Answer to the Verified Complaint.

To serve upon defendant, Stone Point Capital, LLC, a copy of the Verified Complaint and related suit papers.

**TO THE ABOVE NAMED DEFENDANT:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney named above, an answer to the Verified Complaint, judgment by default will be rendered against you for the relief demanded in the Complaint.

Dated: September 15, 2020

_____
Register in Chancery

*Original*

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ARTHUR J. GALLAGHER & CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 2020-0780-___ |
| v. | ) | |
| | ) | **SUMMONS** |
| ALLIANT INSURANCE SERVICES, | ) | ***6 Del. C.* § 18-105** |
| INC., AND STONE POINT CAPITAL, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>SUMMONS</u>

Please effectuate service pursuant to 6 *Del. C.* § 18-105 upon:

**Stone Point Capital, LLC**
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE  19808

SERVICE TO BE COMPLETED BY SPECIAL PROCESS SERVER –
Morris, Nichols, Arsht & Tunnell LLP

Kenneth J. Nachbar (#2067)
Ryan D. Stottmann (#5237)
Thomas P. Will (#6086)
Miranda N. Gilbert (#6662)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE  19801
(302) 658-9200
*Attorneys for Plaintiff*

# *RETURN OF SERVICE*

### IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

**CASE NO:**      2020-0780-JTL

**SERVED:**      STONE POINT CAPITAL, LLC

**DOCUMENT:**   SUMMONS; COMPLAINT; SUPPLEMENTAL INFORMATION SHEET; STATEMENT
PURSUANT TO COURT OF CHANCERY RULE 4(d)(c); VERIFICATION; STATEMENT OF
GOOD CAUSE; MOTION TO EXPEDITE WITH PROPOSED ORDER

**ADDRESS:**     C/O CORPORATION SERVICE COMPANY, 251 LITTLE FALLS DRIVE, WILMINGTON, DE 19808

**DATE:**      09/16/2020

## MANNER OF SERVICE

☒   **PERSONAL:**      ACCEPTED BY:   LYNANNE GARES (AUTHORIZED PERSON AT REGISTERED AGENT)

☐   **SUBSTITUTE:**

☐   **NO SERVICE:**

KEVIN S. DUNN      PROCESS SERVER

BRANDYWINE PROCESS SERVERS, LTD
PO BOX 1360
WILMINGTON DE 19899
302-475-2600

SWORN ~~TO BEFORE~~ ME ON   09/16/2020

NOTARY PUBLIC

DENORRIS ANGELO BRITT
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires May 1, 2022

*BRANDYWINE PROCESS SERVERS, LTD  PO BOX 1360  WILMINGTON, DE 19899*

# EXHIBIT J

EFiled:  Sep 15 2020 05:24PM EDT
Transaction ID 65932373
Case No. 2020-0780-JTL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 2020-0780-JTL |
| | ) |
| ALLIANT INSURANCE SERVICES, | ) |
| INC., AND STONE POINT CAPITAL, | ) |
| LLC, | ) |
| | ) |
| Defendants. | ) |

## MOTION FOR ADMISSION
### *PRO HAC VICE* OF ANDREW M. BERDON

Miranda N. Gilbert, a member of the bar of the State of Delaware, pursuant to Rule 170(b) moves the admission *pro hac vice* of Andrew M. Berdon, of Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, 22nd Floor, New York, NY 10010, to represent Plaintiff Arthur J. Gallagher & Co. in this action.  Movant certifies that she finds the applicant to be a reputable and a competent attorney, and that she is in a position to recommend the applicant's admission.  The applicant is admitted, practicing and in good standing in the State of New York.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Miranda N. Gilbert*
Kenneth J. Nachbar (#2067)
Ryan D. Stottmann (#5237)
Thomas P. Will (#6086)
Miranda N. Gilbert (#6662)
1201 North Market Street
Wilmington, DE  19801
(302) 658-9200
  *Attorneys for Plaintiffs*

Words:  96

September 15, 2020

EFiled:  Sep 15 2020 05:24PM EDT
Transaction ID 65932373
Case No. 2020-0780-JTL

## <u>CERTIFICATION</u>

Andrew M. Berdon hereby certifies:

1.      That he is a member in good standing of the bar of the State of New York.

2.      That the attorney shall be bound by the Delaware Lawyers' Rules of Professional Conduct and has reviewed the Principles of Professionalism for Delaware Lawyers, as effective on November 1, 2003, and as amended;

3.      That he and all attorneys of the applicant's firm who directly or indirectly provide services to the party or cause at issue shall be bound by all Rules of the Court;

4.      That, without exception, he does not maintain an office in the State of Delaware, and consents to the appointment of the Register of Chancery of New Castle County as agent upon whom service of process may be made for all actions, including disciplinary actions, that may arise out of the practice of law under this Rule and any activities related thereto;

5.      That he has appeared in the following action in the courts of record in Delaware in the preceding twelve months: *Mountain West Series of Lockton Companies, LLC v. Alliant Insurance Services, Inc.*, C.A. No. 2019-0226-JTL;

6.    That a payment for the *pro hac vice* admission assessment in the amount of $422.00 is attached to be deposited in the Supreme Court registration fund for the purpose of the governance of the Bar of its Court and may be distributed pursuant to Supreme Court Rule 71; and

7.    That, without exception, he has not been disbarred or suspended, and is not the object of any pending disciplinary proceedings in any jurisdiction where the applicant has been admitted generally, *pro hac vice*, or in any other way.

8.    That he has been admitted generally to the bar of the State of New York.

Dated:    September 14, 2020                    Andrew Berdon
                                                _____
                                                Andrew M. Berdon

2

EFiled:  Sep 15 2020 05:24PM EDT
Transaction ID 65932373
Case No. 2020-0780-JTL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 2020-0780-JTL |
| | ) |
| ALLIANT INSURANCE SERVICES, | ) |
| INC., AND STONE POINT CAPITAL, | ) |
| LLC, | ) |
| | ) |
| Defendants. | ) |

### [PROPOSED] ORDER GRANTING MOTION
### FOR ADMISSION *PRO HAC VICE* OF ANDREW M. BERDON

The foregoing application of Andrew M. Berdon for admission to practice in this action *pro hac vice* is hereby granted.

IT IS SO ORDERED, this ___ day of _____, 2020.

_____
Vice Chancellor

**EFiled:  Sep 15 2020 05:24PM EDT
Transaction ID 65932373
Case No. 2020-0780-JTL**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  C.A. No. 2020-0780-JTL |
| | ) |
| ALLIANT INSURANCE SERVICES, | ) |
| INC., AND STONE POINT CAPITAL, | ) |
| LLC, | ) |
| | ) |
| Defendants. | ) |

## MOTION FOR ADMISSION
### *PRO HAC VICE* OF LAZAR P. RAYNAL

Miranda N. Gilbert, a member of the bar of the State of Delaware,

pursuant to Rule 170(b) moves the admission *pro hac vice* of Lazar P. Raynal, of

Quinn Emanuel Urquhart & Sullivan, LLP, 191 North Wacker, Suite 2700,

Chicago, IL 60610, to represent Plaintiff Arthur J. Gallagher & Co. in this action.

Movant certifies that she finds the applicant to be a reputable and a competent

attorney, and that she is in a position to recommend the applicant's admission.  The

applicant is admitted, practicing and in good standing in the State of Illinois.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Miranda N. Gilbert*
Kenneth J. Nachbar (#2067)
Ryan D. Stottmann (#5237)
Thomas P. Will (#6086)
Miranda N. Gilbert (#6662)
1201 North Market Street
Wilmington, DE  19801
(302) 658-9200
   *Attorneys for Plaintiffs*

Words:  94

September 15, 2020

EFiled:  Sep 15 2020 05:24PM EDT
Transaction ID 65932373
Case No. 2020-0780-JTL

## <u>CERTIFICATION</u>

Lazar P. Raynal hereby certifies:

1.     That he is a member in good standing of the bar of the State of Illinois.

2.     That the attorney shall be bound by the Delaware Lawyers' Rules of Professional Conduct and has reviewed the Principles of Professionalism for Delaware Lawyers, as effective on November 1, 2003, and as amended;

3.     That he and all attorneys of the applicant's firm who directly or indirectly provide services to the party or cause at issue shall be bound by all Rules of the Court;

4.     That, without exception, he does not maintain an office in the State of Delaware, and consents to the appointment of the Register of Chancery of New Castle County as agent upon whom service of process may be made for all actions, including disciplinary actions, that may arise out of the practice of law under this Rule and any activities related thereto;

5.     That he has not appeared in any actions in the courts of record in Delaware in the preceding twelve months;

6.     That a payment for the *pro hac vice* admission assessment in the amount of $422.00 is attached to be deposited in the Supreme Court

registration fund for the purpose of the governance of the Bar of its Court and may be distributed pursuant to Supreme Court Rule 71; and

      7.    That, without exception, he has not been disbarred or suspended, and is not the object of any pending disciplinary proceedings in any jurisdiction where the applicant has been admitted generally, *pro hac vice*, or in any other way.

      8.    That he has been admitted generally to the bar of the State of Illinois.

Dated:    September 14, 2020                           

                        Lazar P. Raynal

EFiled:  Sep 15 2020 05:24PM EDT
Transaction ID 65932373
Case No. 2020-0780-JTL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ARTHUR J. GALLAGHER & CO.,   )
                                 )
        Plaintiff,       )
                                 )
    v.                    )  C.A. No. 2020-0780-JTL
                                 )
ALLIANT INSURANCE SERVICES, )
INC., AND STONE POINT CAPITAL, )
LLC,                           )
                                 )
        Defendants.    )

## [PROPOSED] ORDER GRANTING MOTION
## FOR ADMISSION *PRO HAC VICE* OF LAZAR P. RAYNAL

The foregoing application of Lazar P. Raynal for admission to practice in this action *pro hac vice* is hereby granted.

IT IS SO ORDERED, this ___ day of _____, 2020.

_____
Vice Chancellor

# EXHIBIT K

Click to Print                                    Printed on: 9/17/2020 14:51:33 GMT-0400 (Eastern Daylight Time)

**Case History Search**

Search Created:
9/17/2020 14:51:33 GMT-0400 (Eastern
Daylight Time)

---

| | | | |
|---|---|---|---|
| **Court:** DE Court of Chancery Civil Action | **Judge:** Laster, J Travis | **File & ServeXpress Live Date:** | 9/14/2020 |
| **Division:** N/A | **Case Number:** 2020-0780-JTL | **Document(s) Filed:** | 16 |
| **Case Type:** Contract | **Case Name:** Arthur J. Gallagher & Co. v. Alliant Insurance Services, Inc. and Stone Point Capital, LLC | **Date Range:** | All |

1-5 of 5 transactions   <<Prev  Page 1 of 1  Next>>

| Transaction | Date/Time | Option | Case Number Case Name | Authorizer Organization | # | Document Type | Document Title | Review Status | Size |
|---|---|---|---|---|---|---|---|---|---|
| 65938329 | 9/16/2020 4:02 PM EDT | File And Serve | 2020-0780-JTL Arthur J. Gallagher & Co. v. Alliant Insurance Services, Inc. and Stone Point Capital, LLC | Miranda Gilbert, Morris Nichols Arsht & Tunnell LLP-Wilmington | 9 | Summons | Summons Pursuant to 6 Del. C. Section 18-105 directed to Stone Point Capital, LLC (with Proof of Service) • Linked to (3) | Accepted | 0.1MB |
| 65932373 | 9/15/2020 5:24 PM EDT | File And Serve | 2020-0780-JTL Arthur J. Gallagher & Co. v. Alliant Insurance Services, Inc. and Stone Point Capital, LLC | Miranda Gilbert, Morris Nichols Arsht & Tunnell LLP-Wilmington | 7 | Motion for Pro Hac Vice | Berdon, Andrew M: Motion for Admission Pro Hac Vice on behalf of Plaintiff Arthur J. Gallagher & Co. • Linked to (1) | Accepted | 0.1MB |
| | | | | | 8 | Motion for Pro Hac Vice | Raynal, Lazar P: Motion for Admission Pro Hac Vice on behalf of Plaintiff Arthur J. Gallagher & Co. • Linked to (1) | Accepted | 0.1MB |
| | | | | | | Certification for Pro Hac Vice | Berdon, Andrew M: Certification to Motion for Admission Pro Hac Vice on behalf of Plaintiff Arthur J. Gallagher & Co. | Accepted | 0.3MB |
| | | | | | | Proposed Order - Pro Hac Vice | Berdon, Andrew M: [Proposed] Order to Motion for Admission Pro Hac Vice on | Accepted | 0.1MB |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | behalf of Plaintiff Arthur J. Gallagher & Co. | | |
| | | | | | Certification for Pro Hac Vice | Raynal, Lazar P: Certification to Motion for Admission Pro Hac Vice on behalf of Plaintiff Arthur J. Gallagher & Co. | Accepted | 0.2MB |
| | | | | | Proposed Order - Pro Hac Vice | Raynal, Lazar P: [Proposed] Order to Motion for Admission Pro Hac Vice on behalf of Plaintiff Arthur J. Gallagher & Co. | Accepted | 0.1MB |
| 65934356 | 9/15/2020 4:02 PM EDT | File And Serve | 2020-0780-JTL Arthur J. Gallagher & Co. v. Alliant Insurance Services, Inc. and Stone Point Capital, LLC | J Travis Laster, DE Court of Chancery Civil Action | 6 | Letter | Letter to counsel from Vice Chancellor Laster scheduling the initial scheduling conference for Friday, September 18, 2020, at 11:00 a.m. | Accepted | 0.1MB |
| 65933739 | 9/15/2020 3:15 PM EDT | File And Serve | 2020-0780-JTL Arthur J. Gallagher & Co. v. Alliant Insurance Services, Inc. and Stone Point Capital, LLC | Register in Chancery, DE Court of Chancery Civil Action | 5 | Issuance of Summons | Issuance of Summons to Law Firm (1) Original and (1) copy for 6 Del. C. 18- 105 by Special Processor Service ; (1) Original and (1) Copy 10 Del C. 3104 by Overnight ; (1) Original (1) Copy 8 Del. C. 266 Special Processor service. • Linked from (1) | Accepted | 0.3MB |
| 65930601 | 9/14/2020 6:54 PM EDT | File Only | 2020-0780-JTL Arthur J. Gallagher & Co. v. Alliant Insurance Services, Inc. and Stone | Miranda Gilbert, Morris Nichols Arsht & Tunnell LLP- Wilmington | 1 | Complaint with 1 or 2 defendants | Verified Complaint for Tortious Interference with Contract and Prospective Economic Advantage- | Accepted | 1.2MB |

| | | | Point Capital, LLC | | | | Prospective Business Relationships, Aiding and Abetting Breach of Fiduciary Duty, and Civil Conspiracy<br>• Linked from (4) | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 2 | Motion to Expedite | Plaintiff's Motion to Expedite<br>• Linked from (1) | Accepted | 0.1MB |
| | | | | | 3 | Summons Instructions | Letter from Miranda N. Gilbert to Register in Chancery regarding summons instructions pursuant to 10 Del. C. Section 3104, 8 Del. C. Section 266 and 6 Del. C. Section 18-105<br>• Linked from (1) | Accepted | 0.1MB |
| | | | | | 4 | Letter | Letter from Ryan D. Stottmann to Chancellor Bouchard requesting assignment of this action at the Court's earlier convenience | Accepted | 0.1MB |
| | | | | | | Supplemental Information Sheet | Supplemental Information Pursuant to Rule 3(a), with Statement of Good Cause | Accepted | 0.1MB |
| | | | | | | Verification to Complaint | Verification of Michael P. Pesch Pursuant to 10 Del. C. Section 3927 | Accepted | 0.2MB |
| | | | | | | Proposed Order | [Proposed] Order Expediting Proceedings | Accepted | 0.1MB |

1-5 of 5 transactions   <<Prev   Page 1 of 1   Next>>